# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 2, 2001 Session

## STATE OF TENNESSEE  v.  LARRY ALLEN HICKS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Hamilton County**
**No. 221717     Hon. Douglas A. Meyer, Judge**

---

**No. E1999-00957-SC-R11-CD - Filed September 11, 2001**

---

The primary issue in this case is whether drivers' license roadblocks are constitutionally reasonable under Article I, section 7 of the Tennessee Constitution.  After officers stopped the appellant at a drivers' license checkpoint, they discovered marijuana in the front seat of his car.  The appellant later successfully moved to suppress the evidence, arguing that the roadblock did not conform to this Court's decision in State v. Downey, 945 S.W.2d 102 (Tenn. 1997).  The State appealed to the Court of Criminal Appeals, which reversed the trial court and found that the roadblock was constitutionally reasonable.  We granted permission to appeal and hold that the roadblock in this case was established and operated contrary to Article I, section 7 and our decision in Downey.  We reverse the judgment of the Court of Criminal Appeals.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the**
**Court of Criminal Appeals Reversed; Indictment Dismissed**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which JANICE M. HOLDER, J., joined. E. RILEY ANDERSON, C.J., filed a concurring opinion, in which ADOLPHO A. BIRCH, JR., J., joined. FRANK F. DROWOTA, III, J., filed a concurring and dissenting opinion.

Jerry H. Summers, Chattanooga, Tennessee, for the appellant, Larry Allen Hicks.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Daryl J. Brand, Associate Solicitor General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

At 1:15 a.m. on October 11, 1997, the appellant, Larry Allen Hicks, was stopped at a roadblock on Suck Creek Road near the Hamilton County and Marion County line. This roadblock, which was established ostensibly as a drivers' license roadblock pursuant to General Order 410 of the Department of Safety, was conducted by six police officers, including two officers each from the Tennessee Highway Patrol, the Chattanooga Police Department, and the Red Bank Police Department. One of the Chattanooga officers was a K-9 officer, and another officer carried a picture of a suspect known as the "North Chattanooga rapist."

After stopping the appellant's car, Officer Penny of the Red Bank Police Department requested to see the appellant's license. During this time, one officer on the scene detected the smell of marijuana coming from the appellant's car, and the K-9 officer walked his dog around the car to sniff for drugs. When the dog alerted that drugs were present, the officers placed the appellant under arrest and called their supervisor, Lieutenant Ronnie Hill of the highway patrol, to the scene of the stop. A subsequent search of the appellant's car uncovered five pounds of marijuana in the passenger seat. Neither of the highway patrol officers personally participated in the appellant's stop or arrest.

Following his arrest, the appellant moved to suppress the evidence against him, alleging that the stop was unreasonable under Article I, section 7 of the Tennessee Constitution and that it represented an arbitrary intrusion into his reasonable expectation of privacy. At the hearing on the motion held on November 10, 1998, the appellant called one of the officers, Sergeant Gregory Short, to testify as to the details of the roadblock. Officer Short stated that the officers did not provide any advance publicity concerning the roadblock, that they did not post any signs warning approaching motorists of the roadblock, and that they did not use any orange safety cones to direct traffic. He also testified that none of the officers was wearing a safety vest or carrying an illuminated baton as was otherwise required by General Order 410 for night roadblocks. According to Officer Short, the only evidence that a roadblock was in operation was the presence of the officers and the two highway patrol cars. Finally, Officer Short testified that officers other than those with the highway patrol stopped cars to request licenses and that some officers questioned drivers further about matters unrelated to the license check.

The appellant also called Lieutenant Hill to testify as to the operation of the roadblock. Lieutenant Hill stated that he was ordered to supervise the roadblock during his shift by his troop leader, Lieutenant Phillips, and that he explained to the other officers already present that the purpose of the roadblock was to check for drivers' licenses. Despite having "supervisory" authority over the operation of the roadblock, Lieutenant Hill testified that he was unaware that the other officers on the scene were not following the specific requirements of General Order 410; that he did not know why the Red Bank or Chattanooga officers were present or who called them; and that he was unaware of the actions of certain officers questioning drivers about the "North Chattanooga rapist." Lieutenant Hill also confirmed that he did not participate in the appellant's stop or arrest.

After hearing the testimony, the trial court granted the appellant's motion to suppress. The State appealed to the Court of Criminal Appeals, which reversed the trial court's decision. The

intermediate court held that drivers' license roadblocks are generally permissible under the Tennessee Constitution, and a majority of the court further held that the particular roadblock at issue in this case was operated in a reasonable manner. In dissent, Judge Tipton wrote that because an officer other than a state trooper stopped the appellant's car, the drivers' license checkpoint was statutorily illegal. He further reasoned that because the statute represented a legislative declaration that such stops were unreasonable, the trial court's suppression of the evidence should be affirmed.

The appellant then requested permission to appeal to this Court, which we granted, on the following three issues: (1) whether drivers' license roadblocks are unconstitutional *per se*; (2) whether the roadblock in this case was unconstitutional for its failure to follow the guidelines established by our decision in State v. Downey, 945 S.W.2d 102 (Tenn. 1997); and (3) whether the roadblock was unlawful because of its delegation of statutory authority to local police officers to stop motorists for a license check.[1] We hold that the State has failed to establish a sufficiently compelling interest justifying the need to maintain drivers' license roadblocks and that the particular roadblock in this case failed to comply with the standards set forth in Downey. The judgment of the Court of Criminal Appeals is reversed.

## STANDARD OF APPELLATE REVIEW

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23. However, when the trial court does not set forth its findings of fact upon the record of the proceedings, we will decide on our own where the preponderance of the evidence lies. Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001); see also Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997). As in all cases on appeal, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" See State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)). Finally, we review the trial court's conclusions of law under a *de novo* standard without according any presumption of correctness to those conclusions. See, e.g., State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

---

[1] We also granted permission to appeal to decide whether Tennessee Code Annotated sections 55-50-351(a) and 40-7-103(c) are unconstitutional because they allow officers of the Tennessee Highway Patrol to randomly stop motorists to check drivers' licenses. We agree with the Court of Criminal Appeals in this case that the decision of the United States Supreme Court in Delaware v. Prouse, 440 U.S. 648 (1979), and our opinion in Robertson v. State, 184 Tenn. 277, 198 S.W.2d 633 (1947), seem to substantially undermine the constitutional propriety of these two statutes. See also State v. McCulloch, 906 S.W.2d 3, 5 (Tenn. Crim. App. 1995) ("[I]t is well established that baseless random vehicle stops for the mere purpose of checking license and registration information are impermissible under both state and federal law."). Nevertheless, because this issue was not raised in either of the lower courts, we decline to fully address it here. Moreover, application of the plain error doctrine is not appropriate in this case because construction of these statutes is not necessary to accomplish substantial justice—this case does not involve random stops by officers of the Tennessee Highway Patrol. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000).

**ANALYSIS**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Article I, section 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures, and we have long held that this provision is identical in intent and purpose with the Fourth Amendment. See, e.g., State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); State v. Vineyard, 958 S.W.2d 730, 733 (Tenn. 1997). When examining the scope and application of the prohibition against unreasonable searches and seizures, we must be cognizant that the essence of this protection "is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Downey, 945 S.W.2d at 106 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)).

"Without question, the temporary detention of individuals during the stop of a vehicle by police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' which implicates the protection of both the state and federal constitutional provisions." Vineyard, 958 S.W.2d at 734; State v. Yeargan, 958 S.W.2d 626, 631 (Tenn. 1997). When an officer stops a motorist with probable cause or reasonable suspicion to believe that unlawful conduct has occurred, the stop is generally considered constitutionally reasonable under both the Fourth Amendment and Article I, section 7. Vineyard, 958 S.W.2d at 734. On the other hand, when an officer lacks even reasonable suspicion that criminal activity has taken place, his or her law enforcement authority "is limited to informal questioning of the persons involved." State v. Crutcher, 989 S.W.2d 295, 300 (Tenn. 1999); see also State v. Daniel, 12 S.W.3d 420, 425 (Tenn. 2000).

In one limited circumstance, however, this Court has permitted officers to stop and detain a vehicle without even a modicum of suspicion of unlawful conduct. In State v. Downey, 945 S.W.2d 102 (Tenn. 1997), this Court held that officers may stop motorists at a roadblock to detect drivers operating under the influence of alcohol, even though the conduct of the motorists was otherwise "ordinary, innocent, and free from suspicion." We acknowledged that this holding was "a departure" from the fundamental requirement that no seizure may occur without at least "a founded suspicion based on articulable facts that the person is or has engaged in criminal activity." Id. at 104. Nevertheless, we concluded that a sobriety roadblock may be constitutionally reasonable so long as "an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field, and the seizure is carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Id. at 110. Accordingly, the essential questions to be resolved in this case are whether the roadblock at issue was permissible in light of Article I, section 7 of the Tennessee Constitution, our decision in Downey, and various protections afforded by statute.

-4-

# I. IMPROPER DELEGATION OF STATE HIGHWAY PATROL AUTHORITY TO LOCAL POLICE OFFICERS

Because courts should not generally decide constitutional issues if the case may be properly resolved on nonconstitutional grounds, see State v. Burdin, 924 S.W.2d 82, 87 (Tenn. 1996); Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995), we first address whether the evidence in this case should have been suppressed because local police officers unlawfully stopped motorists to check drivers' licenses and vehicle registrations. Tennessee Code Annotated section 55-50-351(a) provides that

> [I]t is unlawful for any law enforcement officer of this state, except a state patrol officer or officer of the department, to demand the exhibition of such [drivers'] licenses, unless the operator of the motor vehicle is then engaged in, or immediately prior to such demand has been engaged in, a violation of any municipal ordinance or statute law of this state.

In addition, Tennessee Code Annotated section 40-7-103(c) (1997) provides that no officer "except members of the Tennessee highway patrol acting pursuant to [section] 4-7-104, shall have the authority to stop a motor vehicle for the sole purpose of examining or checking the operator's license of the driver of such vehicle." Citing both of these statutes, the appellant argues that the roadblock in this case was statutorily illegal because officers other than those with the Tennessee Highway Patrol actually stopped his car and requested to see his operator's license.

A majority of the intermediate court found that these statutes conflicted with Tennessee Code Annotated section 55-50-804 (1998), which requires a driver to display his or her license "upon demand of any officer or agent of the department or any police officer of the state, county or municipality . . . ." The majority then held that the conflict between section 55-50-804 and the statutes cited by the appellant should be resolved in favor of the former because it was the last in time to be enacted. Writing in dissent, Judge Tipton opined that the statutes cited by the appellant have not been superseded by section 55-50-804 because all three statutes can be harmoniously construed to permit local officers to request an operator's license, so long as those same officers do not initiate the stop in order to do so.

We disagree with the majority of the Court of Criminal Appeals in so far as it found an irreconcilable conflict between these statutes. The legislature is always presumed to know of its prior enactments, see, e.g., State v. Levandowski, 955 S.W.2d 603, 604 (Tenn. 1997), and consequently, courts should find repeals by implication only when statutes cannot be construed harmoniously, see, e.g., Cronin v. Howe, 906 S.W.2d 910, 912 (Tenn. 1995). In this case, the various statutes can be reasonably construed so as to give effect to each, and we find no need to resort to the "last-in-time" canon of construction to resolve a supposed conflict.

Section 55-50-804 does not address the ability of officers *to initiate* a stop of a motor vehicle to conduct a license check, but it speaks only to the general authority of officers to request a driver

to display his or her license. On the other hand, sections 55-50-351(a) and 40-7-103(c) are quite emphatic that only state highway patrol officers possess the authority to initiate the stop of a vehicle for this purpose, and these two statutes do not speak to whether other officers may request a license *after* a stop has been initiated. Consequently, we agree with Judge Tipton that the legislature probably intended for section 55-50-804 to apply only to motorists that have already been stopped for a violation of the law. Assuming this to be the case, then, the roadblock at issue here was in clear violation of sections 55-50-351(a) and 40-7-103(c) because the record unequivocally shows that the appellant's stop was initiated by local police officers.

However, our finding that the roadblock in this case was operated contrary to statutory requirements does not necessarily resolve the issue of whether the evidence seized as a result of this roadblock should be suppressed. Importantly, suppression of evidence is not required if the statutory violation does not actually infringe upon a specific constitutional protection or guarantee. See Walton, 41 S.W.3d at 93. Judge Tipton believed that because the statutes represented a legislative declaration that seizures contrary to the statute were unreasonable, the violation of sections 55-50-351(a) and 40-7-103(c) warranted suppression of the evidence obtained from the roadblock. While this view may have possessed some merit at the time that Judge Tipton penned his dissent, we are reluctant to adopt a similar holding today. Since the time that this case was pending before the intermediate court, the legislature has amended section 55-50-351(a) to permit "any police officer of the state, county, or municipality" to request display of drivers' licenses. See 2001 Tenn. Pub. Acts ch. 700, § 12 (effective July 1, 2001). Accordingly, any legislative declaration in this regard must be weighed in favor of approving the stop.

Moreover, we have found no authority for holding that the employment status of the officer requesting to see the license may alone be determinative of the constitutional reasonableness of the seizure. Instead, the statutory violation appears relevant only to the extent that it, along with other factors, contributes to finding an unreasonable intrusion on the liberty and privacy of motorists. Therefore, because resolution of this statutory issue does not lead to a full and proper resolution of the case, we must address the constitutionality of the roadblock itself.

## II. CONSTITUTIONALITY OF THIS ROADBLOCK UNDER ARTICLE I, SECTION 7 OF THE TENNESSEE CONSTITUTION

Our decision in State v. Downey did not address the constitutional propriety of roadblocks for purposes other than to detect motorists driving under the influence of alcohol. Recognizing this fact, the appellant has urged this Court to find that roadblocks established for the sole purpose of checking drivers' licenses and vehicle registration are unconstitutional *per se* under the federal and state constitutions. Although the United States Supreme Court has never expressly held that drivers' license roadblocks are constitutionally permissible under the Fourth Amendment, it has suggested that such may be the case upon a proper showing. For example, in Delaware v. Prouse, 440 U.S. 648, 663 (1979), the United States Supreme Court held that motorists could not be randomly stopped by officers checking for drivers' licenses or vehicle registration, but it noted that the questioning of all motorists at a roadblock could be one "possible alternative." The Court has also acknowledged

this view, albeit in dicta, in at least two cases since Prouse. See City of Indianapolis v. Edmond, 531 U.S. 32, 39-40 (2000); Texas v. Brown, 460 U.S. 730, 739 (1983) (plurality opinion).

Nevertheless, the issue of whether a drivers' license roadblock is constitutionally permissible under the Tennessee Constitution has not been decided by this Court. We acknowledged in Downey that although federal cases interpreting the Fourth Amendment are "particularly persuasive" authority for construing Article I, section 7, the Tennessee Constitution can provide greater protection for its citizens against unreasonable searches and seizures. See 945 S.W.2d at 106. Accordingly, in analyzing the constitutionality of roadblocks under Article I, section 7, we adopted the test similar to that established in Brown v. Texas, 443 U.S. 47 (1979), which generally analyzes the reasonableness of seizures that are less intrusive than full arrest. See id. at 110. As applied by Downey to roadblocks, this test examines three factors: (1) the gravity of the public concerns served by the roadblock; (2) the degree to which the roadblock advances the public interest; and (3) the severity of the roadblock's interference with an individual's liberty or privacy. See id. at 107-08; cf. Brown, 443 U.S. at 50-51; Michigan v. Sitz, 496 U.S. 444, 450 (1990).

We reaffirm that the test adopted in Downey is to be applied in all cases involving constitutional challenges to roadblocks or checkpoints under the Tennessee Constitution. Although the Court of Criminal Appeals analyzed the issues in this case as constituting "per se" and "as applied" challenges, Downey made no such constitutional distinctions. It may be true that when the State cannot identify a sufficiently grave public concern justifying a roadblock, the roadblock could be characterized as being unconstitutional "per se." It may also be true that when a roadblock exhibits an unreasonable level of intrusion on liberty or privacy, it may be characterized as being unconstitutional "as applied." However, these characterizations encourage analysis outside of the test adopted in Downey, and this analysis creates a heightened danger that constitutional standards will not be uniformly and consistently applied. Accordingly, we decline to address the arguments in terms of unconstitutionality "per se" and "as applied" and instead continue to determine the reasonableness of this roadblock by using the three-pronged test as set forth in Downey.

### A. THE GRAVITY OF THE PUBLIC CONCERN SERVED BY THE ROADBLOCK

With respect to the gravity of the public concerns served by drivers' license roadblocks, we must first identify the state interest in maintaining such roadblocks and then determine whether this interest is sufficiently compelling to abrogate constitutional protections against suspicionless stops. The presence of a sufficiently compelling state interest justifying a warrantless seizure at a checkpoint is an important, if not essential, factor going to the overall constitutional reasonableness of any such stop. The need and importance of this factor were acknowledged in Downey, which devoted considerable attention to examining whether the State possessed a sufficiently "compelling" interest in maintaining sobriety checkpoints.

Moreover, persuasive authority for initially requiring the presence of a sufficiently compelling state interest can be found in other cases decided since Downey's release, perhaps most

notably the recent decision from the United States Supreme Court in <u>City of Indianapolis v. Edmond</u>. In that case, the Court held a roadblock unconstitutional solely because its primary purpose "contravene[d] the Fourth Amendment." <u>See</u> 531 U.S. at 42. Therefore, we believe that critical examination of the nature and presence of the state interest involved is an important and essential factor in ascertaining the reasonableness of any roadblock. As such, we first undertake a careful study of the State's asserted interest in this case and of the proof in the record to support the presence of this interest.

*THE NATURE OF THE STATE'S INTEREST*

The nature of the State's interest in this case is easily identified because the State has consistently argued that this roadblock was established only as a checkpoint to ensure highway safety by detecting and deterring unlicensed drivers. While some evidence admittedly exists to the contrary as to the true purpose of this particular roadblock, we will presume for sake of the present analysis that the State's interest is as asserted. Therefore, the essential inquiry here is whether the State's asserted interest is sufficiently compelling so as to justify suspicionless stops at a roadblock.

With respect to the sufficiently compelling nature of this interest, we acknowledge that we gave no specific indication in <u>Downey</u> of when a State interest becomes sufficiently compelling so as to justify suspicionless seizures at a checkpoint. However, it is clear from the analysis of that opinion that the State's interest in detecting and deterring drivers under the influence of alcohol was sufficiently compelling for three reasons: (1) the State's interest in maintaining the roadblock was directly tied to the ability of drivers to safely operate motor vehicles on the roads and highways of the state; (2) the harm sought to be eliminated by the roadblock was one that posed an imminent danger of death or serious bodily injury; and (3) the magnitude of the problem, coupled with its harm, was such that it commanded heightened action.[2] When the purpose for a roadblock is arguably related to maintaining highway safety, we believe that these standards as set forth in <u>Downey</u> are sound, and we therefore require a similar showing in this case. Although these standards do not necessarily comprise the *sine qua non* of a sufficiently compelling state interest when the roadblock is arguably related to highway safety, any additional considerations justifying suspicionless stops of an automobile should be related in kind.[3]

_____

[2] In support of the compelling nature of the interest at stake in <u>Downey</u>, we found that the State's interest in detecting and deterring drunk drivers was directly tied to highway safety because operation of vehicles while under the influence of alcohol had resulted in more deaths and injuries "than from all the wars this country has fought." In support of the sheer magnitude of the DUI problem, the Court noted the "overwhelming" statistical evidence of the problem, the fact that the legislature has increased the penalties for DUI "at nearly every session," and anecdotal evidence from daily newspaper and television accounts of the "carnage and tragedy" of drunk driving.

[3] This required showing applies only to suspicionless stops at investigatory, non-emergency roadblocks. We do not address the required showing for other checkpoints, such as those established for apprehending fleeing felons or for fixed weigh-and-inspection stations.

The concurring-dissenting opinion authored by Justice Drowota asserts that by requiring specific proof of the presence of the State's compelling interest, we are somehow being unfaithful to the test adopted in Downey. Indeed, the concurring-dissenting opinion takes the position that while the importance of the State's interest will affect the "weighing process," no case has required the State to first possess a compelling interest before examining the other aspects of the roadblock. In essence, the concurring-dissenting opinion asserts that the absence of a sufficiently compelling interest may be offset by minimal police intrusion into the personal liberty and privacy of the motorists. We do not agree.

In asserting that no case has ever required the State to initially set forth a sufficiently compelling interest, the concurring-dissenting opinion overlooks the fact that identifying a separate and distinct state interest with regard to Article I, section 7 was key to Downey itself. See 945 S.W.2d at 109-10. It is true that Downey did not dwell upon the importance of the State's interest in curbing incidents of DUI, but unlike the asserted interest in this case, the compelling nature of the interest in Downey was already abundantly clear from the proof as identified by the Court. As such, the Court instead focused its opinion on whether the roadblock's intrusion into personal liberty and privacy was too severe. The Court's primary focus on the severity of the intrusion, however, should not be construed as minimizing the need to identify and prove a sufficiently compelling interest in the first instance. Importantly, the Downey Court's discussion of the standards to minimize intrusion and limit discretion occurred only *after* the Court first "recognize[d] the State's compelling interest in detecting and deterring motorists who drive while under the influence of alcohol." 945 S.W.2d at 110.

Moreover, the concurring-dissenting opinion makes no mention in this regard of the United States Supreme Court's recent decision to the contrary in Edmond. In that case, the Court held a roadblock invalid *solely* because the asserted interest—general crime detection—was an "impermissible purpose" under Fourth Amendment analysis. See 512 U.S. at 47. Notably, the Court did not further examine the issue of whether the roadblock was established with minimal intrusions into the liberty and privacy of the motorists, but it instead affirmed that "a program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar." Id. To be clear, then, as far as the Fourth Amendment is concerned, the inquiry of whether a sufficiently compelling interest exists in the first instance is a separate, and independent, inquiry from whether the level of police intrusion into liberty and privacy is minimal.

Both Downey and Edmond are quite persuasive authorities for the view that a roadblock will necessarily fail constitutional examination if it lacks a sufficiently compelling state interest. As such, contrary to the conclusion reached by the concurring-dissenting opinion, we conclude that the presence of a sufficiently compelling interest is necessary under Article I, section 7 before an examination of the other aspects of a roadblock may proceed.

*PROOF SUPPORTING THE STATE'S INTEREST IN THIS CASE*

Turning to the proof in this case, we find that despite the State's argument that drivers' license roadblocks are necessary to ensure the safety of motorists on the roads, no evidence in the record establishes this fact or, even if true, establishes that this interest is sufficiently compelling to justify suspicionless stops. Precisely because a roadblock "is a departure from [the] fundamental principles" contained in Article I, section 7 that a seizure must be accompanied by at least some measure of individualized suspicion, Downey, 945 S.W.2d at 104, we will not presume the presence of a compelling state interest to justify further expanding the scope of permissive suspicionless seizures. As we have noted before in other cases, a warrantless seizure "'is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression, unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.'" State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997); State v. Crutcher, 989 S.W.2d 295, 299-300 (Tenn. 1999).

Because the exceptions to the warrant requirement "are jealously and carefully drawn," the State must show that "the exigencies of the situation made the search [or seizure] *imperative*." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (emphasis added and internal quotations omitted). Therefore, as required in Downey, the State must show that drivers not possessing a license are unable to safely operate motor vehicles on the roads and highways of this state; that an unlicensed driver invariably presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers; and that the safety threat from unlicensed drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention. Only when this showing is made may courts find that the State has a sufficiently compelling interest to justify maintaining drivers' license roadblocks.

We are not unaware of the fact that some decisions from the Court of Criminal Appeals appear to have approved of drivers' license roadblocks after finding that the State possesses "significant" and "legitimate" interests in regulating vehicles and drivers on state highways.[4] We agree that the State possesses valid and important interests in this respect, but because the State has the burden of establishing the reasonableness of the seizure, one may not merely presume that these interests are sufficiently compelling to justify abrogating constitutional guarantees. Only when the State makes the required showing, as it has previously done with sobriety checkpoints, may courts accept the presence of the compelling interest and proceed to further analyze the roadblock under this decision and Downey.

Using a rationale similar to that sometimes adopted by the intermediate court, the concurring-dissenting opinion in this case opines that the State possesses a "vital" interest in maintaining drivers' license roadblocks sufficient to permit suspicionless stops. More specifically, the

---

[4] See, e.g., State v. Steward, No. M1999-01284-CCA-R3-CD, 2000 WL 1246436 (Tenn. Crim. App. filed at Nashville, Aug. 18, 2000); State v. Hagy, No. 03C01-9505-CR-00152, 1995 WL 712355, (Tenn. Crim. App. filed at Knoxville, Dec. 5, 1995).

concurring-dissenting opinion presumes that such roadblocks are urgently needed because (1) persons too young to drive pose a threat to public safety, and (2) persons who have had their licenses suspended for DUI convictions or traffic offenses often disregard that suspension, thereby endangering public safety on the roads. We do not disagree that such concerns may be present, and if these concerns demonstrate a real need to curb a substantial and imminent threat to the safety of motorists on public roads, which distinctly results from the conduct of these unlicensed drivers, then the first prong of the Downey test will have been satisfied. Indeed, it is for these reasons, and perhaps some others, that we have clarified the State's burden of proving the presence of these concerns in future cases.

To be sure, however, the record in this case contains absolutely no proof of the urgent necessities identified by the concurring-dissenting opinion, and mere suspicions and conjectures of the possibilities of such dangers are never adequate to justify abrogation of constitutional liberties. History has demonstrated that the infinite faculties of mankind are such that one may devise any supposed danger or peril to justify further erosion of constitutionally protected liberties. If these factually unsupported suppositions could justify further abrogation of the warrant requirement of Article I, section 7, then every protection now guaranteed by this important provision would be subject to the irrational assault of pretended evils certain to follow. Merely declaring that the interest exists in theory is not the same as demonstrating that the need exists in fact.

Furthermore, by alleviating the State's burden of production regarding its compelling interest, the concurring-dissenting opinion essentially places the burden on the defendant to retain his or her constitutional protections under Article I, section 7 by disputing the State's presumed interest. This Court has always required the State to bring forth evidence to demonstrate the propriety of a warrantless search. By presuming the presence of a sufficiently compelling interest without proof in the record of any real dangers involved, the concurring-dissenting opinion takes a perilous step in a path that shifts the burden of proof to the defendant to show the lack of a sufficiently compelling interest justifying a warrantless seizure. If other courts have taken similar paths as the concurring-dissenting opinion has attested, Article I, section 7 demands that we take the road less traveled.

Finally, the concurring-dissenting opinion expresses the concern that the requirements for establishing the presence of a sufficiently compelling state interest are too burdensome. These requirements are precisely those demanded by Downey itself, and the extent of the burden is neither more nor less than was required by that case. Indeed, while the burden to be carried by the State may be heavy, one may legitimately question what purpose is served by abrogating Downey when the label of the roadblock is changed. Just as the Court looked to proof of a sufficiently compelling interest in Downey to justify sobriety checkpoints, we must also demand similar proof to justify drivers' license checkpoints.

However, while we will not presume that proof exists supporting the presence of a sufficiently compelling state interest, we are also unwilling to adopt the views of Chief Justice Anderson and hold that such evidence *cannot* exist either. The concurring opinion authored by the Chief Justice correctly asserts that "the possession of a drivers' license does not necessarily assure

the safety and fitness of any motorist." However, the concurring opinion then asserts that no such proof *could* ever exist, because "there is no basis upon which to reasonably conclude that a motorist who is not in possession [of] a valid drivers' license necessarily poses an immediate danger of death or serious bodily injury great enough to warrant the suspicionless stops of all drivers at a checkpoint." (emphasis in original).

We are reluctant to hold today, as would the concurring opinion, that the lack of proof in this record conclusively demonstrates that the State has no sufficiently compelling interest in establishing a drivers' license roadblock. Rather, the lack of evidence in this record stems more from the fact that the State has not had a meaningful opportunity to develop the record in this regard. Hicks did not specifically assert the lack of a sufficiently compelling state interest in support of his original motion to suppress, and the trial judge apparently did not consider this issue in granting the defendant's motion. Indeed, this issue was not squarely presented in any court until Hicks raised it for the first time as appellee in the Court of Criminal Appeals.

Given the procedural history of this case, we disagree that the State had a meaningful opportunity to introduce proof of its interest in maintaining drivers' license roadblocks. Importantly, both this Court and the Court of Criminal Appeals possess appellate jurisdiction only, and our ability to receive and hear evidence not presented in the trial court is severely restricted. See Duncan v. Duncan, 672 S.W.2d 765, 768 (Tenn. 1984); see also Tenn. R. App. P. 14. As such, we disagree that a party is necessarily afforded a meaningful opportunity to present evidence and be heard merely because an issue has been raised and determined in the appellate courts. Because our concern should always be to ensure that litigants are fully and fairly heard before their interests are adjudicated, prudence dictates that the State be given a meaningful opportunity to present evidence of its claims before its interests are conclusively determined.

Had the motion to suppress squarely put the State on notice of its need to present evidence to show a sufficiently compelling interest to justify stopping motorists lawfully traveling along the highways of this state, and had the State under those circumstances failed to present such evidence, then we would not hesitate to agree with the conclusion reached by the Chief Justice. However, because our review of the record indicates that the issue was not pleaded or tried during the hearing on the motion to suppress, the prudent and reasonable path is for this Court to rule upon the record as developed in this case and not to foreclose the possibility that the State can establish a sufficiently compelling interest in future cases.

In demonstrating this sufficiently compelling state interest in these future cases, however, we emphasize that the State may not merely rely upon its general interest in maintaining highway safety to justify suspicionless seizures of its citizens, no matter how "minimal" one may be able to characterize the intrusion. To the extent that the State's justification for maintaining a roadblock does not reflect a real, compelling interest in curbing a substantial and imminent threat to the safety of motorists on public roads, one may be unable to distinguish this supposed interest in safety from a more general interest in ordinary crime control. However, as the United States Supreme Court has made clear, and as we agree has long been the law in Tennessee, in no case may the State establish

a roadblock merely "to detect evidence of ordinary criminal wrongdoing." Edmond, 531 U.S. at 41. Instead, "[w]hen law enforcement authorities pursue primarily general crime control purposes at checkpoints . . . , stops can only be justified by some quantum of individualized suspicion." Id. at 47. Therefore, unlike many of our sister states, this Court will not presume the existence of a compelling interest until the State introduces some proof of the need to curb a substantial and imminent threat to the safety of motorists on public roads distinctly resulting from the conduct of unlicensed drivers.[5]

Moreover, we also emphasize that the State may not merely rely upon its general interest in maintaining the integrity of its drivers' licensing scheme to justify future roadblocks. We see no indication from the record that the State's interest in enforcing a drivers' license law is any greater than its interest in enforcing any other law, and indeed, the State's interest in enforcing other criminal laws is at least as great as it is in enforcing laws regulating drivers' licenses. If the State may not legitimately establish roadblocks to detect other violations, it follows that the State may not do so merely to enforce drivers' license laws. Therefore, to justify suspicionless stops in this context, the State must necessarily rely upon the need to curb a substantial and imminent threat to the *safety* of motorists on public roads distinctly resulting from the conduct of unlicensed drivers.

Accordingly, because the record has not been sufficiently developed in this case for this Court to make a definitive determination as to the compelling nature of the State interest involved, we cannot find that the State has demonstrated a sufficiently grave public concern so as to warrant further expansion of the roadblock exception under the Article I, section 7. While we do not foreclose the possibility that the State could assert a compelling interest in future cases concerning the need to establish drivers' license roadblocks, the absence of any such evidence in this case must weigh very heavily against, if not be fatal to, finding the roadblock at issue here constitutionally reasonable.

---

[5] We note, as does the opinion authored by Justice Drowota, that many federal and state cases interpreting the Fourth Amendment have found that the state may possess interests adequate to establish drivers' license roadblocks, though these cases uniformly reach this conclusion without the benefit of specific guidelines or requirements of proof. The concurring-dissenting opinion suggests that the showing required by this case is greater than that required by the Fourth Amendment, and it is apparently "puzzled" by our decision to closely adhere to Downey when doing so could result in the Tennessee Constitution granting greater protections to its citizens than would the Fourth Amendment.

Although the concurring-dissenting opinion correctly postulates that Article I, section 7 is "identical in purpose and intent" with the Fourth Amendment, it overlooks the fact that such identity of intent and purpose "does not necessarily correlate to coextensive degrees of protection. In fact, this Court's decisions applying the state constitution have been somewhat more restrictive than comparable federal cases in some search and seizure contexts." Planned Parenthood v. Sundquist, 38 S.W.3d 1, 13 (Tenn. 2000) (Drowota, J., concurring in judgment) (internal quotation marks omitted). Therefore, if following prior state constitutional precedent has the incidental effect of compelling a decision that is not necessarily warranted by federal law, we believe it to be required by Article I, section 7. To be clear, however, our decision today is grounded solely in Article I, section 7 and flows from our decision in Downey. Any federal cases cited as authority for our interpretation of Article I, section 7 are used only for the purpose of guidance and do not themselves compel the result reached today. See Michigan v. Long, 463 U.S. 1032, 1041 (1983).

### B.  THE DEGREE TO WHICH THE PUBLIC CONCERN IS
### FURTHERED BY THE SEIZURE

In addition to requiring a sufficiently compelling state interest, our decision in Downey also required an examination of the degree to which the presence of the roadblock advances that compelling state interest.  In Prouse, the United States Supreme Court stated that any type of suspicionless seizure must promote the asserted state interest in a "sufficiently productive" fashion before it could "qualify as a reasonable law enforcement practice."  440 U.S. at 660.  We recognized this principle in Downey, although we noted that courts should generally refrain from analyzing whether other constitutionally reasonable measures are *more* effective in accomplishing the state's interest. 945 S.W.2d at 108-09.  Accordingly, this second prong of the Downey test may be satisfied when one can fairly say that roadblocks contribute in a meaningful way to achieving the sufficiently compelling state interest.

The State did not introduce any evidence at the suppression hearing to establish the presence of this factor.  From our own review of the record, we note that the roadblock at issue here, which was conducted over a two-night period, did not uncover a single driver who was operating a vehicle without a valid license.  Although the failure to detect any unlicensed drivers could be theoretically attributable to the deterrence provided by the roadblock, we seriously doubt that such was the case here because no advanced publicity of the roadblock was given to the public at large.  As we recognized in Downey, the need to deter certain types of conduct can justify a roadblock even when the evidence otherwise suggests that the particular roadblock is ineffective in detecting the object of its operation.  However, before motorists can be reasonably deterred by roadblocks, they must first be aware that they are likely to encounter such roadblocks, and advanced publicity is one key to ensuring this awareness.  Cf. State v. Hooper, 29 S.W.3d 1, 11 (Tenn. 2000) (discussing publicity and public knowledge as a key factor in deterrence philosophy).[6]  Therefore, so long as the State chooses to rely on deterrence as a rationale supporting any roadblock, we reiterate that advance publicity of the roadblock may be *essential*, and in those cases where this factor is absent, the State's ability to rely upon deterrence to justify the stops is correspondingly diminished.

We also find no evidence in the record from which one could infer that the complete ineffectiveness of this roadblock in detecting unlicensed drivers was somewhat of an anomaly.  For example, no proof exists that the time and site of this roadblock were chosen because of their

---

[6] It may be supposed by some that drivers would be deterred by the chance of encountering *unpublicized* roadblocks.  Even if true, it cannot be doubted that deterrence is always enhanced by publicity and public knowledge of the roadblocks.  Therefore, to the extent that the State relies upon deterrence as a justification for roadblocks, it must take some measures to ensure that deterrence is actually accomplished. Cf. State v. Garcia, 500 N.E.2d 158, 162 (Ind. 1986) ("[T]he deterrent effect of such a highly publicized program is obvious; such a visible project is bound to increase the perceived risk of arrest in the minds of those drunk drivers who are never arrested." (citing Lowe v. Commonwealth, 337 S.E.2d 273, 277 (Va. 1985))); People v. Bartley, 486 N.E.2d 880, 888 (Ill. 1985) ("In fact, if a major goal of a roadblock searching for drunken drivers is deterrence, that goal is promoted by publicity.  The more aware drivers are that they may be stopped at such a roadblock, the more likely they will be to seek alternate means of transportation when they are drinking or to refrain from drinking when they know they will be driving.").

effectiveness in detecting and deterring unlicensed drivers. The State introduced no proof that unlicensed drivers are particularly likely to be driving during the times that these roadblocks were in operation, *i.e.*, between 12:00 a.m. and 4:00 a.m., and we doubt that this fact is even supported by anecdotal evidence in a manner similar to that supporting drunk drivers. Nor did the State introduce evidence that the site of the roadblock was chosen because of the particularly high volume of traffic or numerous incidents of unlicensed drivers. Cf. Ingersoll v. Palmer, 743 P.2d 1299, 1315 (Cal. 1987). To be clear, these factors are not required to demonstrate that the checkpoint contributes in a meaningful way to achieving the compelling state interest. Nevertheless, to the extent that these factors are considered by law enforcement officers or are otherwise apparent on the face of the record, the questionable effectiveness of an individual roadblock may be mitigated.[7]

We cannot find a roadblock to be constitutionally reasonable unless the State first demonstrates some meaningful link between its establishment and the achievement of its compelling interest. Because the record in this case contains no such evidence, we cannot fairly conclude that the roadblock in this case meaningfully contributed to achieving the state's interest in detecting and deterring unlicensed drivers. Taking issue with this conclusion, the concurring-dissenting opinion asserts that the second prong of the Downey test is met in this case because "there is no better way" of detecting unlicensed drivers than through roadblocks. Assuming this fact to be true, we note that the lack of other effective alternatives does not alone bestow the blessing of constitutional reasonableness upon an otherwise totally ineffective roadblock. Whatever else may be said of the presence of viable alternatives, it is clear that the roadblock must promote the asserted state interest in a "sufficiently productive" fashion before it can "qualify as a reasonable law enforcement practice." Cf. Prouse, 440 U.S. at 660.[8] Therefore, the absence of this proof must also weigh heavily against finding that the roadblock here was constitutionally reasonable.

---

[7] Indeed, the peculiar time of this "drivers' license" checkpoint and its seemingly remote location could be factors that give rise to a finding that its primary purpose was not to detect unlicensed drivers. Cf. State v. Stearns, 524 S.E.2d 554, 556 (Ga. Ct. App. 1999) ("A valid purpose of roadblocks is to locate and arrest those who are abusing the privilege of driving on public roads by driving while they are intoxicated. . . . It is not unreasonable that such roadblocks would be located where such drivers would be expected to be at a time they might be expected to be there."). By introducing some proof that unlicensed drivers are particularly likely to drive at this time of night or in this location, the State minimizes the risk that a court will find an administrative subterfuge or that the primary purpose of the roadblock is not sufficiently compelling to justify the suspicionless stops.

[8] Indeed, the concurring-dissenting opinion seems to beg the question of reasonableness in this regard. By overlooking the ineffectiveness of the roadblock in this case, the concurring-dissenting opinion assumes that the roadblock is a reasonable intrusion because there is "no better way" of detecting unlicensed drivers. However, because a seizure cannot be constitutionally reasonable if it is ineffective in achieving the state interest involved, cf. Prouse, 440 U.S. at 660, the effectiveness of a roadblock is an important measure of its constitutional reasonableness. Therefore, we disagree that the presence or lack of other alternatives should be of any great concern. Although we will not choose among various "*reasonable* law enforcement approaches," Downey, 945 S.W.2d at 110 (emphasis added), we will not abdicate our responsibility to determine what is reasonable in the first instance merely because "no better way" has been found.

-15-

## C. INTRUSIVENESS OF THE ROADBLOCK AT ISSUE IN THIS CASE

Regarding the severity of the interference with personal liberty and privacy, we have held that a roadblock cannot be deemed constitutionally reasonable unless "it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene." Downey, 945 S.W.2d at 104. To this end, our decision in Downey enumerated several characteristics of a roadblock that minimize the risk of arbitrary intrusion under Article I, section 7, including (1) stopping all cars traveling in both directions, unless congested traffic requires permitting motorists to pass through; (2) taking adequate safety precautions, such as warning approaching motorists of the roadblock and stopping cars only in a safe and visible area; (3) conducting the roadblock with uniformed officers and marked patrol cars with flashing emergency lights; and (4) providing advanced publicity of the roadblock to the public at large, separate from, and in addition to, any notice warnings given to approaching motorists. Although the absence of any one of these factors does not necessarily invalidate a roadblock, they each weigh heavily in determining the overall reasonableness of the checkpoint. Id. at 110-12 *passim.*

However, the most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of the officers in the field. Two facts are critical to finding that the officers' discretion on the scene was properly limited: (1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock. In all cases, therefore, the State must show that some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation. See id. *passim.* To be clear, these factors are so essential to a reasonable roadblock that the absence of either of them will necessarily result in the invalidation of the stops.

### *FACTORS MINIMIZING THE RISK OF ARBITRARY INTRUSION*

Applying these criteria to the roadblock in this case, we initially find that the roadblock lacked many of the attributes necessary to minimize the risk of arbitrary intrusion into the personal liberty and privacy of the motorists. Consistent with Article I, section 7, the officers did wear official uniforms, and the officers had one marked patrol car at each end of the roadblock with flashing emergency lights. However, contrary to our decision in Downey, the roadblock was operated with little regard to the safety of the approaching motorists. Although the roadblock was conducted at night, the record shows that the officers did not use any lighting separate from the patrol cars, and it appears that the officers could safely stop cars only on one side of the road. Further contrary to Downey, the officers placed no advanced warning signs giving approaching motorists notice of the upcoming roadblock. Not only is this requirement especially important to ensure the safety of motorists, but the presence of advanced warning signs also "reassure[s] motorists that the stop is duly authorized," thereby diminishing the possibility of surprise, concern, or fright. See Ingersoll, 743 P.2d at 1316. Although the Constitution does not require all of these specific

measures, we cannot conceive of a reasonable roadblock that fails to adequately protect the safety of the passing motorists.

Further, we find that no advance publicity was given to the public at large that the highway patrol intended to conduct a roadblock in this area. We emphasize that the advance publicity requirement of Downey was not merely an afterthought or a constitutionally needless restriction upon otherwise legitimate law enforcement activity. Apart from the important deterrence aspects discussed earlier, advanced publicity also gives citizens the important choice of not exposing themselves to state intrusion without prior suspicion of wrongdoing. Moreover, citizens who are aware that they may be subject to roadblocks have more of a basis to "anticipate and understand the circumstances" of the stop. See Jones v. State, 459 So. 2d 1068, 1076 (Fla. Dist. Ct. App. 1984). Although the absence of publicity will not invariably render a checkpoint invalid if other measures satisfy these concerns, the advanced publicity requirement of Downey must nevertheless be regarded as a key aspect of a minimally intrusive roadblock. Accordingly, we find that the absence of many of the attributes necessary to minimize the risk of arbitrary interference with the liberty and privacy of motorists weighs heavily against finding this roadblock to be constitutionally reasonable.

## PRIOR ADMINISTRATIVE APPROVAL AND ADEQUATE SUPERVISORY AUTHORITY

Most importantly, however, the record does not show that the checkpoint was "established and operated in accordance with predetermined operational guidelines and supervisory authority." First, we find no evidence that this roadblock was initially established with prior administrative authority. Lieutenant Hill testified that he supervised the roadblock during his shift upon orders from Lieutenant Phillips, and the Court of Criminal Appeals found that this fact suggested the presence of prior administrative approval. However, our review of the record indicates that it was Lieutenant Phillips who established this roadblock in the first instance and that Lieutenant Hill was only responsible for its continuation.[9] Downey clearly condemns the same person holding the power to approve and establish a roadblock, and the disconcerting appearance of this fact in any record is necessarily fatal to a finding of reasonableness under Article I, section 7.

We recognize the possibility that Lieutenant Phillips obtained administrative approval prior to his establishing of the roadblock, but absolutely no proof of this fact exists in the record. Importantly, Lieutenant Hill was only able to speculate that such may have been the case, and the State did not introduce any other testimony or documentation to show that administrative approval

---

[9] Though admittedly unclear, the record seems to indicate that Lieutenant Hill either continued a roadblock already in operation or that he was the last officer to arrive on the scene to start the operation of an already established checkpoint. Lieutenant Hill's testimony indicates that Lieutenant Phillips was the officer responsible for initially arranging and setting up the roadblock and that Phillips could not establish a roadblock without approval from higher authorities. Because Downey requires that the officer *establishing* the roadblock obtain prior administrative approval, Lieutenant Hill's operation of an already established roadblock is seemingly irrelevant to prove the presence of prior administrative approval.

existed in fact. Although the State could have called a witness with actual knowledge, such as Lieutenant Phillips, or otherwise introduced a paper record of the prior approval from the Department of Safety, it did neither. Because the State has the burden of establishing the reasonableness of the roadblock, it must introduce *some* proof of prior administrative approval before courts may conclude that such was the case. Unlike the intermediate court, we attribute little significance to the fact that Lieutenant Hill was unconnected with the establishment of this roadblock, and we are not willing to equate this circumstance with actual proof of prior administrative approval as required by Downey. Because the State introduced no other proof of prior administrative approval, we find that the preponderance of the evidence establishes that the roadblock was not initiated in conformity with constitutional requirements.

Second, the record shows that the discretion of the officers on the scene of this roadblock was not properly limited or supervised and that the officers actually conducting the checkpoint had virtually complete discretion to decide for themselves the procedures to be used in its operation. Although the Department of Safety has issued administrative guidelines to be followed at drivers' license roadblocks, the extreme deviations from General Order 410 in this case demonstrate that adequate supervision was practically nonexistent. Despite Lieutenant Hill's affirmative obligation to ensure compliance with General Order 410, see General Order 410, para. V.C. (effective Sept. 30, 1995), the record indicates that the following violations of the General Order occurred: (1) officers used the roadblock to search for crimes other than violations of drivers' license requirements, as evidenced by the presence of a drug dog and the pictures of the "North Chattanooga rapist," id. para. VI.A; (2) the officers did not clearly convey their intent to check for valid drivers' licenses to all motorists as they were stopped, id. para. VI.B; (3) the officers did not post any signs to warn motorists that a roadblock was ahead, id. para. VI.D.2; (4) officers other than uniformed commissioned officers of the Tennessee Highway Patrol stopped vehicles and demanded exhibition of the operator's license, id. para. VII.B.2;[10] (5) the officers did not use orange safety vests, id. para. VII.D; (6) the officers did not use orange or red flashlight batons, id. para. VII.D; and (7) the officers did not use spotlights at the scene to give proper illumination, id. para. VII.F. Had the supervision of the officers on the scene been adequate, we have no doubt that many, if not all, of these violations would have been either prevented or corrected.[11]

---

[10] At the suppression hearing, Lieutenant Hill admitted that the practice of county deputies stopping cars to check licenses, even at a roadblock, is contrary to General Order 410 and that such a practice is also contrary to his understanding of Tennessee Code Annotated sections 40-7-103(b) and 55-50-351(a). The fact that he permitted the roadblock to continue operation in violation of several statutes is strong evidence that the roadblock was not conducted with adequate supervision.

[11] Our opinion today should in no way be construed as giving constitutional approval to drivers' license roadblocks conducted in the manner contemplated by General Order 410. We mention the numerous and substantial deviations from the administrative regulations only to demonstrate that little or no supervisory authority existed on the scene of this roadblock. To the extent that any General Order regulating any type of roadblock is inconsistent with our decision in this case or with our decision in Downey, no measure of compliance with that Order will sustain the checkpoint as reasonable under Article I, section 7.

-18-

Moreover, the testimony given at the suppression hearing demonstrates that Lieutenant Hill did not adequately supervise the conduct of the officers during the appellant's stop. For example, Sergeant Short of the Chattanooga Police Department testified that Lieutenant Hill was completely unaware of the following circumstances: that the appellant's car had been pulled over solely on the authority of local officers; that the officers detected the smell of marijuana in the appellant's car; that the officers conducted a canine sniff of the appellant's car; or that the officers proceeded to search the car. It was only after the appellant's arrest that Lieutenant Hill was made aware of these proceedings. Sergeant Short further testified that during this time, Lieutenant Hill was "standing in the road," apparently unconcerned with what the local officers were doing around him.

We conclude that the extreme deviations from the administrative guidelines, coupled with testimony about the nature of the supervision, demonstrate that the discretion of the officers on the scene was not limited in any meaningful sense. Our decision in Downey was adamant that genuine limitations on the officers' discretion was an essential component of the roadblock exception to Article I, section 7, and we rejected the view that the absence of formal, supervisory participation was entitled to "little weight." 945 S.W.2d at 110. To the contrary, active and careful supervision is critical to the constitutional reasonableness of any roadblock, and because the record indicates that the discretion of the officers in this case was not limited in any significant manner, we conclude that this roadblock fails analysis under our interpretation of Article I, section 7 in Downey.

*THE EFFECT OF A SUBTERFUGE OR PRETEXT*

Finally, the preponderance of the evidence suggests that the roadblock in this case was actually operated for purposes other than as a drivers' license checkpoint. In Downey, we alluded to the fact that an ostensibly legitimate roadblock operated as a pretext or subterfuge to further illegitimate law-enforcement practices may be unreasonable under the Tennessee Constitution. 945 S.W.2d at 111. However, we did not actually reach this issue in Downey, because the actual purpose of the drivers' license roadblock in that case was to detect and deter drunk drivers—a legitimate and sufficiently compelling state interest. Because we found that the primary purpose of the Downey roadblock was constitutionally permissible, the analysis of that case more properly focused on the lack of adequate administrative and supervisory oversight.

Nevertheless, we acknowledged then, and we reiterate now, that a checkpoint designed or operated to further illegitimate law enforcement practices under the pretext of a lawful purpose is unreasonable under Article I, section 7, irrespective of other indicia of reasonableness. If the subterfuge exists on the administrative or planning level, such that the roadblock is primarily designed to further a noncompelling state interest, the roadblock will necessarily fail for lack of a sufficiently compelling state interest. See Edmond, 531 U.S. at 44, 47. Furthermore, operation of a roadblock so as to pursue illegitimate objectives is virtually incontrovertible evidence that inadequate levels of control and supervision of the officers on the scene are being maintained. Downey, 945 S.W.2d at 111. While we will not seek to determine the intent of the individual officers in the field once a sufficiently compelling state interest is found, cf. Vineyard, 958 S.W.2d

736, the actions of the officers and the circumstances surrounding the stops should be considered as evidence of inadequate administrative and supervisory oversight.

Our close examination of the record reveals much evidence to show that this drivers' license roadblock was designed and operated as a method to pursue objectives other than detecting and deterring unlicensed drivers. On the administrative level, the time and place of the roadblock do not seem calculated, at least in an intuitive sense, to detect unlicensed drivers, and the fact that the State introduced no proof that the time and site of the roadblock were chosen because of their effectiveness in detecting and deterring unlicensed drivers further indicates that the "drivers' license" checkpoint was a subterfuge.[12] On the operational level, the record shows that at least one officer on the scene possessed and used a drug dog, and another officer seems to have conducted the roadblock for the purposes of apprehending a fleeing felon. Because neither of these purposes is arguably related to any interest served by a checkpoint established to detect and deter unlicensed drivers, see United States v. Morales-Zamora, 974 F.2d 149, 153 (10th Cir. 1992) (finding pretextual drivers' license checkpoint, in part, when officers brought drug dog to scene before cars were stopped), one may infer that at least some officers were pursuing investigatory agendas that were wholly distinct and apart from the State's claimed interest.

While officers are not required to look the other way when they legitimately discover violations, they may not, as appears to have happened here, actively seek out other criminal wrongdoing under the guise of checking for drivers' licenses.[13] In State v. Vineyard, 958 S.W.2d

---

[12] The trial court made no finding of the primary purpose of this roadblock, and we need not do so here. On appeal, though, the prevailing party at the suppression hearing is entitled to the strongest legitimate view of the evidence, State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996), and as no proof exists to the contrary, a reasonable inference arises that the time and place of the roadblock were not chosen so as to detect unlicensed drivers. Indeed, if one assumes that the vast majority of citizens, licensed or unlicensed, will not be traveling on the roads at 2:00 a.m., one may infer that the roadblock was not designed to deter unlicensed drivers either.

[13] Indeed, we take notice of the fact that the sobriety roadblocks, which we permitted in Downey only under heightened constitutional requirements, are being operated in some cases under the guise of "drivers' license" checkpoints without regard to Downey. For example, in State v. Steward, No. M1999-01284-CCA-R3-CD, 2000 WL 1246436 (Tenn. Crim. App. filed at Nashville, Aug. 30, 2000), the Court of Criminal Appeals noted the following candid testimony from an officer who participated in a "drivers' license" checkpoint:

> THE COURT: Trooper, why did Sergeant Ray, I suppose, decide to conduct one kind of roadblock instead of the other?
> [Trooper] McALLISTER: Usually, all we hold is the traffic enforcement-type roadblock. The sobriety roadblocks, [under General Order] 410.1, require[] a minimum of six officers and that the colonel pre-approve it five days prior to that.
> THE COURT: So you just decided not to do that and you're going to do the other kind [of roadblocks] and catch the same people?
> McALLISTER: I've been on the [force] for two years, all I've ever held is a traffic enforcement-type roadblock.

(continued...)

730 (Tenn. 1997), we held that an officer's subjective intentions in stopping an automobile, no matter how questionable, would not affect the validity of the stop so long as probable cause existed to believe that the defendant violated the traffic code. 958 S.W.2d at 737. We reasoned that the dangers presented by an individual officer's investigatory agenda were mitigated in such cases because "[t]he probable cause requirement constrains the exercise of police discretion and safeguards the citizenry against arbitrary intrusions." Id. at 735 (citing Whren v. United States, 517 U.S. 806 (1996)).

However, because roadblocks are operated without the protections provided by the probable cause requirement, courts must assume a special role in ensuring that constitutional safeguards are not eroded by subterfuge or pretext. Cf. United States v. Huguenin, 154 F.3d 547, 555 (6th Cir. 1998) ("We believe the Fourth Amendment requires that police deception and subterfuge must be carefully scrutinized in regard to pretextual checkpoints, as checkpoints constitute an exception to the Fourth Amendment's requirement for a warrant and probable cause."). When police officers are permitted, either through administrative design or supervisory neglect, to actively engage in suspicionless investigation of criminal activity wholly unrelated to the purposes of the roadblock, the constitutional protections afforded by Article I, section 7 are rendered utterly without effect or meaning. To be sure, our decision in Downey allowing a narrow exception for sobriety checkpoints was not meant as a signal to law enforcement officers that a citizen's constitutional protections evaporated upon being halted at a roadblock.

Considering all of the circumstances surrounding this roadblock, we must conclude that the preponderance of the evidence establishes that the operation of this roadblock violated minimal constitutional requirements. First, the level of intrusion into the liberty and privacy of the citizens stopped was beyond that characterized as reasonable by Downey. Second, the State offered no evidence to show prior administrative approval, and because the State has the burden of establishing the reasonableness of the roadblock, we will not presume that such was the case. Third, the record demonstrates that the officers on the scene decided for themselves the proper procedures to be followed and that these officers were not adequately supervised. Finally, the record contains much evidence to show that the drivers' license roadblock was initially established and operated in the field as a method to pursue objectives other than to detect and deter unlicensed drivers. Accordingly, we hold that this roadblock represented an unreasonable interference with the liberty and privacy of the citizens stopped in violation of Article I, section 7 of the Tennessee Constitution.

_____

[13] (...continued)

We are unsure how law enforcement officers have come to believe that drivers' license roadblocks may be operated with less concern for constitutional requirements than sobriety roadblocks. Article I, section 7 certainly makes no distinction, and we note that the roadblock in Downey itself was nominally a drivers' license checkpoint. To be sure, no authority from this Court exists for the proposition that drivers' license checkpoints may be operated under different and lessened constitutional standards merely because of the label attached to them.

## CONCLUSION

In summary, we hold that the drivers' license roadblock in this case violates the protections against unreasonable seizures found in Article I, section 7 of the Tennessee Constitution. First, the State has failed to demonstrate a sufficiently compelling state interest to justify suspicionless stops to check drivers' licenses. Second, even assuming the presence of a compelling state interest, the State has not shown that roadblocks are "sufficiently productive" in achieving that interest such that they could "qualify as a reasonable law enforcement practice." Finally, we find that the operation of this roadblock was not conducted according to predetermined operational guidelines or with adequate supervisory authority that would minimize the risk of arbitrary intrusion on individual liberty and limit the discretion of officers at the scene. Accordingly, the decision of the trial court to suppress all evidence derived from the roadblock is affirmed. We reverse the judgment of the Court of Criminal Appeals and dismiss the indictment against the appellant.

Costs of this appeal shall be paid by the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE