IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2004 Session

## STATE OF TENNESSEE v. DENNIS JAMES VARNER

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 238557      Stephen M. Bevil, Judge**

---

**No. E2003-02223-CCA-R3-CD - Filed June 28, 2004**

---

The Defendant, Dennis James Varner, entered a conditional plea of guilty to driving under the influence following the trial court's denial of his motion to suppress evidence attendant upon his stop at a roadblock. The Defendant reserved for this Court's ruling a certified question of law regarding the constitutionality of his stop by law enforcement officers. Upon our review of the record and pertinent legal authority, we have determined that the trial court erred in denying the Defendant's motion to suppress. Accordingly, we reverse the trial court's judgment and dismiss the charges against the Defendant arising out of his stop at a roadblock conducted in contravention of Tennessee's constitution.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Thomas Greenholtz, Chattanooga, Tennessee, for the appellant, Dennis James Varner.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Bill Cox, District Attorney General; and Jason Thomas, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Defendant was stopped during a roadblock conducted by the Hamilton County Sheriff's Department on the night of September 1, 2000. As a result of this stop, the Defendant was arrested for driving under the influence. The Defendant subsequently filed a motion to suppress the evidence adduced in conjunction with his stop, on the grounds that the roadblock did not comport with constitutional requirements. The trial court denied the Defendant's motion after an evidentiary hearing. The Defendant then entered a conditional plea of guilty, reserving as a certified question of law the following dispositive issue: whether the stop of the Defendant's vehicle on September 1, 2000, at a roadblock in Hamilton County, Tennessee, violated Article I, section 7 of the Tennessee

Constitution based on the requirements set forth in State v. Hicks, 55 S.W.3d 515 (Tenn. 2001), and State v. Downey, 945 S.W.2d 102 (Tenn. 1997). The State makes no objection to the form or substance of this reserved question of law, and we have determined that it meets the requirements of Tennessee Rule of Criminal Procedure 37(b)(2)(i). See also State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988). Accordingly, we will address the Defendant's certified question of law on its merits.

## FACTS

Officer Ragan McDevitt testified that, on the night of September 1, 2000, he was working "special assignment." Officer McDevitt described this assignment as "working field sobriety checkpoints." The checkpoints had been authorized by Deputy Chief Tommy Standifer of the Hamilton County Sheriff's Department; no other agencies were involved. The checkpoint at issue in this case was located on the southbound lanes of a divided state highway. Officer McDevitt stated that, although he had not seen the department's procedures for administering sobriety checkpoints, Lieutenant Newman was familiar with the procedures and he was present at the scene. According to Officer McDevitt, Deputy Chief Standifer was also present at the roadblock.

Officer McDevitt stated that the lighting for the roadblock was provided by the emergency lights and headlights on the patrol cars, which numbered approximately ten, as well as flashlights held by the participating officers. There was no other lighting provided. Two K-9 officers were present.

Officer McDevitt stated that there were meetings in which the officers were informed about how the checkpoints would be conducted, but he did not recall what was said at the meetings. Deputy Chief Standifer was in charge of these meetings.

Officer McDevitt stated that he spoke with the Defendant during the Defendant's stop at the checkpoint, and that he "could smell the odor of an alcoholic beverage coming from [the Defendant's] vehicle, his speech was slurred, [and] he had an open beer beside him in the console of his van." Accordingly, Officer McDevitt conducted a further investigation of the Defendant's condition, which resulted in the Defendant's eventual arrest for driving under the influence.

Lieutenant James Newman with the sheriff's department also testified. He had received a memorandum dated August 17, 2000, from Deputy Chief Standifer about Labor Day weekend traffic enforcement. The memorandum was admitted into evidence and provides in pertinent part as follows:

> The Patrol Division will enact some special enforcement for the upcoming long Labor Day Weekend. (Friday Sept. 1 thru Monday Sept. 4).
>
> Officers will be placed on special assignment to assist in conducting sobriety checkpoints and patrol saturation to identify DUI, speeding and aggressive drivers.

On the morning of September 1, the participating officers met and went over the procedures to be used during the roadblocks. Lt. Newman explained that he was the supervisory officer at the roadblock and that he also served as the safety coordinator. As to the nature of the roadblocks, Lt. Newman testified, "We weren't specifically looking for anything, we use it as a safety tool." When questioned about the manner of safety he was referring to, Lt. Newman responded, "Impaired driving or that sort of thing."

Lt. Newman identified a copy of the county's operational guidelines used in conjunction with roadblocks, and stated that the participating officers were informed of their responsibilities under these guidelines. One of the guidelines provides that, "When unreasonable delay results from heavy traffic, the safety coordinator will direct, according to a predetermined plan, that only every third, fourth, or fifth vehicle be checked until the backlog is eliminated." Nevertheless, Lt. Newman testified that, when he thought that traffic became too heavy, he removed the other officers from the road and allowed all of the traffic to flow through until the backlog was eliminated. Lt. Newman agreed that this practice was contrary to the guidelines, and acknowledged that he was responsible for making this determination while on the scene of the roadblock.

Lt. Newman also stated that, in accordance with the guidelines, a press release was prepared concerning the upcoming roadblocks. This press release was dated August 30, 2000, and provided, in pertinent part, as follows:

> During the Labor Day holiday weekend which will consist of (4) days Friday, Sept. 1 - Monday September 04 the Hamilton County Sheriff's Department will increase traffic enforcement to assist with the Holiday Traffic.
>
> Patrol Officers will be conducting sobriety check-points along with highly visible patrol saturation, watching for the drunk or impaired driver, speeding and the aggressive driver in an effort to reduce traffic accidents and fatalities within o[u]r communities and County.
>
> The Sobriety Check-points will be established at different locations or sites in the county. All check-points will be posted with signs alerting all motorist[s] of a pending stop or check-point ahead.
>
> . . .
>
> Further information may be obtained by contacting the following: Deputy Chief Tommy Standifer or Lieutenant Jim Newman . . . .

Following the issuance of this press release, a newspaper article was published providing as follows:

> The Hamilton County Sheriff's Department will increase traffic enforcement over the four-day Labor Day holiday weekend.

Patrol officers will be conducting sobriety checkpoints along with increasing patrols, officials said. In addition, officers will be watching for drunk or impaired drivers and speeding and aggressive driving in an effort to cut down on fatalities.

The sobriety checkpoints will be established at different locations in the county. All checkpoints will be posted with signs alerting drivers of an impending stop.

Further information can be obtained by contacting Deputy Chief Tommy Standifer or Lt. Jim Newman . . . .

Lt. Newman explained that he and Deputy Chief Standifer together determined the locations at which the roadblocks would be placed. Lt. Newman testified that the sites for the roadblocks were "picked by where we've had fatality accidents, high risk as far as speeding type problems, that [sort of] thing. We don't go out just empty-handed and just select, they are selected by, you know, those variouses[sic]." Lt. Newman reiterated this during cross-examination, explaining that he and Deputy Chief Standifer "would talk about [the location of the roadblock] as far as . . . fatalities, locations, problem areas with speed problems and that type thing." Lt. Newman further explained that there was no portable equipment at the roadblock for the purpose of testing a driver's blood alcohol content. Lt. Newman confirmed that Deputy Chief Standifer was present at the roadblock.

At the roadblock where the Defendant was apprehended, 502 cars were stopped during a one hour period. The State offered no proof as to how many of these stops involved motorists driving under the influence.

After hearing the foregoing, the trial court ruled from the bench as follows:

All right. Of course, as I stated, I am familiar with the Downey case . . . . I think the court's concern in the Downey case, and seems to me in the Hicks case as well, is subterfuge. You can't say we're going to have a driver's license checkpoint, we're going to have a speeding checkpoint, when the whole purpose of it is to stop DUIs, and that's the subterfuge. That's what was true and I think the court found in the Downey case and said we're not going to have that.

The Supreme Court of the United States has said you can have checkpoints, you can have roadblocks to stop for the public safety, because driving, first of all, is not a right guaranteed by the Constitution, it's a privilege, and so they can impose roadblocks. And the United States Supreme Court has put its stamp of approval on that.

But you can't have a roadblock set up just as a subterfuge: We're going to check driver's license[s], we've got the canine dogs out here in case one of these people has a bad license but also has cocaine in the car; that's a subterfuge.

-4-

In this case, as far as the gravity of the situation, I think that as was stated it's public safety. On a holiday weekend, Labor Day weekend, statistics show that there are a number of people driving under an influence of an intoxicant and so the County set up a roadblock. They didn't call it a driver's license checkpoint, they didn't call it -- although Lieutenant Newman said "We're checking for safety," I think the reason he said that is because in answer to the question, why did you pick this particular location, because there were speeders, a lot of traffic accidents at this location and it was a likely point in the county to set up a field sobriety or DUI roadblock. And they didn't, they called a spade a spade. They said this is a DUI -- and the policy says operational procedure for DUI roadblocks and checkpoints. And so finally they got to the point and I think they did what they set out to do and what the supreme court said you've got to do: If you're going to have a DUI checkpoint, then call it a DUI checkpoint, don't have a subterfuge for saying you're doing something else when everybody knows this is what you're doing.

So the situation, 520[sic] cars going through there sometime, or at least those that were stopped in an hour, shows that that's a highly traffic[ked] area, and I think there is concern about [that] especially on [a] holiday weekend.

As far as the degree of public interest, again, I think all the public is interested in traffic safety and I think the majority of the public would have no qualms about setting up a roadblock as long as it's a minimal intrusion upon their liberties and it does not inconvenience them in an unnecessary way. And I think the County did whatever they could do at that time to cause minimal intrusions upon the public at that time. They did advertise it to say there's going to be a roadblock in the geographical area of Hamilton County, we're putting anybody that wants to drive under the influence of an intoxicant on Labor Day weekend, you better look out because there will be roadblocks.

Now that, to me, is a notice that should put everybody on notice that there are going to be roadblocks in certain areas of the county and I need to look out for them. They had it posted, they had the lights on out there, as much light as they could get out there at that time of night. Of course, I guess there would be more light in the daylight, they could have set up a field sobriety checkpoint at Brainerd Baptist Church on Sunday morning at 12:00, but I don't think it would have been much -- it's sort of an exercise in futility, but there would have been daylight and there would have been a lot of people coming out of the church, but that's not -- the purpose is public, is safety, and to protect the remainder of the public, those people who choose not to drive under the influence.

And the interference with the public, I think, is very minimal, I think it was a wise decision on the officer's part. Sure, he deviated from the procedure, but, again, it was less restrictive than the actual procedures, because he let everybody go

through to try to keep from traffic backing up and people waiting and waiting and waiting. He let those go through until traffic got caught up and they could start stopping people again.

I think the County did everything they could do. They used good faith to try to comply with the requirements of Downey, the requirements of Hicks and the requirements of [the] United States Supreme Court in setting up this field sobriety roadblock and traffic stop. And I don't think it was an unreasonable stop or an unreasonable search in violation of the Fourth Amendment, I think it complies with the requirements of the United States Supreme Court and the State of Tennessee, so I'm going to overrule the motion to suppress.

## STANDARD OF REVIEW

This Court will uphold a trial court's findings of fact in a suppression hearing unless the evidence preponderates otherwise. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, we will review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. See State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).

## DOWNEY AND HICKS

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Article I, section 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures, and our supreme court has long held that this provision is identical in intent and purpose with the Fourth Amendment. See, e.g., State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); State v. Vineyard, 958 S.W.2d 730, 733 (Tenn. 1997). When examining the scope and application of the prohibition against unreasonable searches and seizures, we must be cognizant that the essence of this protection "is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)). It is the State's burden to establish the reasonableness of a warrantless seizure. See State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997); State v. Crutcher, 989 S.W.2d 295, 299-300 (Tenn. 1999).

In State v. Downey, our supreme court addressed for the first time whether sobriety roadblocks may be permissible under Tennessee's constitutional prohibition against unreasonable searches and seizures. See 945 S.W.2d at 103. The court first recognized that under traditional constitutional principles, before a police officer may seize a person , the officer must possess, at a minimum, some reasonable suspicion, based on specific and articulable facts, that a crime has been or is about to be committed. See, e.g., Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20

L.Ed.2d 889 (1968). A roadblock, however, permits law enforcement officers to seize, if only for a brief time, persons whose conduct has not yet raised any suspicions whatsoever. Accordingly, our supreme court in Downey recognized that "[a] roadblock seizure . . . is a departure from . . . fundamental constitutional principles [because] [i]t permits officers to stop and question persons whose conduct is ordinary, innocent , and free from suspicion." 945 S.W.2d at 104. Looking to the United State's Supreme Court decision in Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), our supreme court determined that whether such seizures would pass constitutional muster depended upon a balancing of the public interest served by the seizure against the severity of the interference with individual liberty. See 945 S.W.2d at 104.

Relying on Michigan v. Sitz, 496 U.S. 444, 447, 110 S.Ct. 2481, 2483, 110 L.Ed.2d 412 (1990), in which the United States Supreme Court concluded that a state's use of a highway sobriety checkpoint did not constitute a per se violation of the Fourth Amendment, the Downey court then determined that the appropriate method for measuring these competing interests was to adopt the three-prong test set forth in Sitz. See 945 S.W.2d at 110. That three-part test consists of the following criteria: a) the gravity of the public concerns served by the seizure; b) the degree to which the seizure advances the public interest; and c) the severity of the interference with individual liberty. See id. at 107. The primary concern to be addressed in conducting this analysis is to assure that "an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field, and the seizure is carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Id. at 110.

Using the three-prong test set forth in Sitz, our supreme court determined that the State has a "compelling interest in detecting and deterring motorists who drive while under the influence of alcohol." Id. The court further concluded that "roadblocks are effective tools in advancing the State's interest in solving a serious public danger." Id. Thus, the first two prongs of the three-part test adopted by the Downey court were found to weigh in favor of the constitutionality of sobriety roadblocks. Indeed, in light of these concerns, the court concluded generally that

> the use of a sobriety roadblock, although a seizure, can be a reasonable seizure under the Tennessee Constitution, provided it is established and operated in accordance with predetermined operational guidelines and supervisory authority that minimize the risk of arbitrary intrusion on individuals and limit the discretion of law enforcement officers at the scene.

Id. at 104.

Nevertheless, the particular roadblock at issue in Downey was found unconstitutional because the method by which the roadblock had been established and conducted had been subject to an excessive amount of discretion by the officers at the scene. See id. at 112. Specifically, the decision to set up the roadblock was made by an officer in the field; the site selected for the roadblock and the procedure to be used in its operation were left to the discretion of an officer in the field; and no prior supervisory authority was sought or obtained and no administrative decisions were made with

regard to these factors. See id. at 110. Furthermore, there was no advance public notice about the roadblock. See id. at 111. Finally, there was a discrepancy between the stated purpose of the roadblock -- to check for drivers' licenses -- and the actual purpose for its establishment, which was to detect alcohol-impaired drivers. See id. In short, there was an "overall failure by law enforcement officers to establish this roadblock in a manner consistent with administrative and supervisory oversight." Id. This failure resulted in insufficient limitations placed on the discretion of the officers at the scene of the roadblock. Accordingly, the roadblock was deemed unconstitutional. See id. at 112.

Our supreme court has spoken most recently on the constitutionality of roadblocks in the case of State v. Hicks, 55 S.W.3d 515 (Tenn. 2001). In Hicks, a roadblock had been established by officers from the Tennessee Highway Patrol, the Chattanooga Police Department, and the Red Bank Police Department. The roadblock was created ostensibly for the purpose of checking drivers' licenses. However, one of the attending officers was a K-9 officer, and another officer carried a picture of a suspect wanted on rape charges. The defendant was stopped pursuant to the roadblock, and one of the officers noticed the smell of marijuana in the defendant's car. The K-9 officer responded with his dog, and the dog indicated the presence of drugs. The defendant was placed under arrest, and five pounds of marijuana were subsequently discovered in the defendant's car.

The defendant filed a motion to suppress the evidence against him on the grounds that the stop violated the Tennessee Constitution. After a hearing, the trial court granted the defendant's motion. On appeal, this Court reversed the trial court's ruling. See State v. Larry Allen Hicks, No. E1999-00957-CCA-R3-CD, 2000 WL 656801, at *12 (Tenn. Crim. App., Knoxville, May 19, 2000). Our supreme court then granted the defendant's request for permission to appeal and reversed this Court's ruling, holding that "the State ha[d] failed to establish a sufficiently compelling interest justifying the need to maintain drivers' license roadblocks and . . . the particular roadblock [at issue] failed to comply with the standards set forth in Downey." Hicks, 55 S.W.3d at 520-21.

Initially, the Hicks court reiterated that "the test adopted in Downey is to be applied in all cases involving constitutional challenges to roadblocks or checkpoints under the Tennessee Constitution." Id. at 524. Accordingly, the first step in analyzing the constitutional efficacy of the roadblock at issue was to "identify the state interest in maintaining such roadblocks and then determine whether this interest is sufficiently compelling to abrogate constitutional protections against suspicionless stops." Id. at 525. The court stressed that the "critical examination of the nature and presence of the state interest involved is an important and essential factor in ascertaining the reasonableness of any roadblock." Id.

In the Hicks case, the State consistently maintained that the purpose of the roadblock was to ensure highway safety by detecting and deterring unlicensed drivers. See id. Relying on Downey, the court analyzed this asserted interest in light of three factors: (1) whether the State's interest in maintaining the roadblock was directly tied to the ability of drivers to safely operate motor vehicles on the roads and highways of the state; (2) whether the harm sought to be eliminated by the roadblock was one that posed an imminent danger of death or serious bodily injury; and (3) whether

the magnitude of the problem, coupled with its harm, was such that it commanded heightened action. See id. The court emphasized that "the presence of a sufficiently compelling interest is necessary under Article I, section 7 [of the Tennessee Constitution] before an examination of the other aspects of a roadblock may proceed." Id. at 527.

Applying these principles to the roadblock before it, the Hicks court determined that, to establish a compelling interest justifying the drivers' license roadblock, the State had to prove (1) that drivers not possessing a license were unable to safely operate vehicles on the state's roads; (2) that an unlicensed driver "invariably" presents an imminent danger of death or serious bodily injury to other drivers that is not typically present with licensed drivers; and (3) that the safety threat from unlicensed drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention. See id. at 527. While acknowledging that unlicensed drivers might cause a sufficient substantial and imminent threat to the driving public so as to meet the first prong of the Downey test, the court held that the State had failed to adduce sufficient proof of any such "urgent necessities" so as to justify suspicionless stops. See id. at 528, 530-31. Accordingly, the Hicks court held that the State failed to satisfy the first prong of the Downey test. See id. at 531.

> Significantly, the court emphasized that, in future cases,
> the State may not merely rely upon its general interest in maintaining highway safety to justify suspicionless seizures of its citizens, no matter how "minimal" one may be able to characterize the intrusion. To the extent that the State's justification for maintaining a roadblock does not reflect a real, compelling interest in curbing a substantial and imminent threat to the safely of motorists on public roads, one may be unable to distinguish this supposed interest in safety from a more general interest in ordinary crime control. However, as the United States Supreme Court has made clear, and as we agree has long been the law in Tennessee, in no case may the State establish a roadblock merely "to detect evidence of ordinary criminal wrongdoing." City of Indianapolis v. Edmond, 531 U.S. 32, 41, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Instead, "[w]hen law enforcement authorities pursue primarily general crime control purposes at checkpoints . . ., stops can only be justified by some quantum of individualized suspicion." Id. at 47, 121 S.Ct. 447. Therefore, . . . this Court will not presume the existence of a compelling interest until the State introduces some proof of the need to curb a substantial and imminent threat to the safety of motorists on public roads distinctly resulting from the conduct of unlicensed drivers.

Id. at 529-30.

The Hicks court went on to consider the second prong of the Downey test, noting that it would be satisfied "when one can fairly say that roadblocks contribute in a meaningful way to achieving the sufficiently compelling state interest [established under the first prong of the test]." Id. at 531. In the case before it, the roadblock revealed no unlicensed drivers, in spite of having been operated over a two-night period. See id. Finding that the State had failed to demonstrate any meaningful link between the operation of the roadblock and the achievement of its purported interest,

the <u>Hicks</u> court found that the roadblock also failed the second prong of the <u>Downey</u> test.  <u>See</u> <u>id.</u> at 532-33.

Finally, the court turned to the severity of the roadblock's interference with personal liberty and privacy, noting that "the most important attribute of a reasonable roadblock is the presence of genuine limitations upon the discretion of the officers in the field."  <u>Id.</u> at 533.  The court continued:

[t]wo facts are critical to finding that the officers' discretion on the scene was properly limited:  (1) the decision to set up the roadblock in the first instance cannot have been made by the officer or officers actually establishing the checkpoint, and (2) the officers on the scene cannot decide for themselves the procedures to be used in operating the roadblock.  In all cases, therefore, the State must show that some authority superior to the officers in the field decided to establish the roadblock, particularly as to its time and location, and that the officers adhered to neutral standards previously fixed by administrative decision or regulation.  <u>To be clear, these factors are so essential to a reasonable roadblock that the absence of either of them will necessarily result in the invalidation of the stops.</u>

<u>Id.</u> at 533 (citation omitted) (emphasis added).   In reiterating this point, Justice Barker later stated flatly in his opinion that "<u>Downey</u> clearly condemns the same person holding the power to approve and establish a roadblock, and the disconcerting appearance of this fact in any record is necessarily fatal to a finding of reasonableness under Article I, section 7."  <u>Id.</u> at 534-35.

In assessing the roadblock before it according to these criteria, the <u>Hicks</u> court determined that the roadblock failed this prong of the <u>Downey</u> test, as well.  <u>See</u> <u>id.</u> at 535.  Specifically, the State introduced no proof that the officer who established and supervised the roadblock while at the scene had earlier obtained administrative approval for doing so.  <u>See</u> <u>id.</u>  Moreover, "the officers actually conducting the checkpoint had virtually complete discretion to decide for themselves the procedures to be used in its operation."  <u>Id.</u>

Finally, the court expressed deep concern that the evidence suggested that the roadblock had been operated in fact for purposes other than as a drivers' license checkpoint.  <u>See</u> <u>id.</u> at 536.  The court elucidated:

Our close examination of the record reveals much evidence to show that this drivers' license roadblock was designed and operated as a method to pursue objectives other than detecting and deterring unlicensed drivers.  On the administrative level, the time and place of the roadblock do not seem calculated, at least in an intuitive sense, to detect unlicensed drivers, and the fact that the State introduced no proof that the time and site of the roadblock were chosen because of their effectiveness in detecting and deterring unlicensed drivers further indicates that the "drivers' license" checkpoint was a subterfuge.  On the operational level, the record shows that at least one officer on the scene possessed and used a drug dog, and

another officer seems to have conducted the roadblock for the purposes of apprehending a fleeing felon. Because neither of these purposes is arguably related to any interest served by a checkpoint established to detect and deter unlicensed drivers, one may infer that at least some officers were pursuing investigatory agendas that were wholly distinct and apart from the State's claimed interest.

Id. at 537 (footnote, citation omitted). Noting that "[w]hen police officers are permitted, either through administrative design or supervisory neglect, to actively engage in suspicionless investigation of criminal activity wholly unrelated to the purposes of the roadblock, the constitutional protections afforded by Article I, section 7 are rendered utterly without effect or meaning." Id. at 538. Accordingly, "a checkpoint designed or operated to further illegitimate law enforcement practices under the pretext of a lawful purpose is unreasonable under Article I, section 7, irrespective of other indicia of reasonableness." Id. at 536.

## ANALYSIS

We turn now to the application of the Downey-Hicks calculus to the roadblock at issue in this case. The first prong of the three-prong Downey test is the gravity of the public concern served by the roadblock. Two of the participating law enforcement officers testified on this point. Officer McDevitt described the roadblock as a "field sobriety checkpoint" but admitted that two canine officers were present. Lt. Newman, who testified that he was the supervisory officer for the roadblock, explained that the roadblock was utilized as a generalized "safety tool," stating plainly that they "weren't specifically looking for anything." When more closely questioned by the State, Lt. Newman responded that the safety concerns meant to be addressed by the roadblock were "impaired driving or that sort of thing." However, Lt. Newman, who participated in determining the location of the roadblock, also explained that the roadblock site was selected because there had been fatal accidents and speeding at that location. Lt. Newman did not testify, however, that either the accidents or the speeding were in any way related to drivers impaired by alcohol. Significantly, the officers had no equipment at the site for testing blood alcohol content.

The trial court concluded that the purpose of the roadblock was "public safety," particularly the detection of motorists driving under the influence of alcohol. The evidence establishes, however, that there was no single specific goal in place for this particular roadblock. Rather, the sheriff's department was seeking to inhibit speeding drivers, "aggressive" drivers (of which the State's witnesses offered no definition), and impaired drivers. Additionally, the State was pursuing a goal nowhere mentioned in the administrative memoranda or guidelines: the interception of those transporting illegal drugs; hence the K-9 officers. Obviously, checking for DUI violations was just one of several actual purposes meant to be realized by this particular roadblock.

As noted above, our supreme court has acknowledged that the State's interest in detecting DUI violations is sufficiently compelling as to justify suspicionless seizures of its citizens, so long as those seizures are carried out in a constitutionally reasonable manner. See generally Hicks and Downey. Where that interest is the primary purpose for which the roadblock is established, the

-11-

roadblock may still pass constitutional muster. See City of Indianapolis v. Edmond 531 U.S. 32, 48, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (to determine the constitutionality of a particular roadblock, the reviewing court must "examine the available evidence to determine the primary purpose of the checkpoint program.") (emphasis added); Downey at 111. In this case, however, and contrary to the trial court's conclusion, the State has simply failed to prove that checking for motorists driving under the influence was the primary purpose for the roadblock. The record contains no proof of the number of arrests made in conjunction with the roadblock; no proof as to the nature of the arrests; testimony that the location was decided upon because of past traffic problems, but no indication that those problems were in any way caused by impaired drivers; testimony that no equipment for testing alcohol impairment was in place at the scene; and testimony that K-9 officers were present. These facts preponderate against a finding that the primary purpose of the roadblock was to check for impaired drivers. The presence of K-9 officers also raises a concern that this roadblock may have been operated, at least in part, as a pretext. Nevertheless, we will analyze whether the State's claim of "highway safety" purposes to be served by the roadblock were sufficiently grave and compelling so as to satisfy the first of the three-prong Downey test.

In addition to pursuing impaired motorists, the proof before us demonstrates that the State was also interested in detecting speeding drivers and those driving "aggressively."[1] Thus, we must determine whether the State has proven (1) that speeding and/or aggressive drivers are unable to safely operate vehicles on the state's roads; (2) that speeding and/or aggressive drivers "invariably" present an imminent danger of death or serious bodily injury to other drivers that is not typically present with law-abiding drivers; and (3) that the safety threat from speeding and/or aggressive drivers is of such a magnitude that the problem, coupled with its risk of harm, commands heightened attention. See Hicks, 55 S.W.3d at 527.

We conclude that the State has not met its burden of proof as to any of these three criteria. Indeed, the State has offered us no proof of the need to curb a substantial and imminent threat to the safety of motorists on public roads distinctly resulting from the conduct of these particular drivers. Moreover, looking at the second of these three criteria, common sense reveals that speeding does not, in and of itself, pose "an imminent danger of death or serious bodily injury." If it did, we are confident that our legislature would more closely align the penalties for speeding convictions with the penalties provided for DUI. As to whether "aggressive" driving creates such a risk, we must point out that the State has failed to offer us any evidence as to what "aggressive" driving is. Thus, the State has failed to carry its burden of proving any compelling interest whatsoever in detecting and/or deterring this amorphous group of motorists. Finally, the State has failed to prove that the safety threat from this group of motorists is of such a magnitude that heightened action is required. Accordingly, we are constrained to hold that these two purposes for which this roadblock was established do not satisfy the first prong of the Downey test. Moreover, because the State has failed

---

[1]We need not analyze whether drivers transporting illegal drugs might constitute a sufficiently compelling state interest to satisfy the first prong of the Downey test because roadblocks established for that purpose are per se violative of the Fourth Amendment. See Edmond, 531 U.S. at 48.

to establish that the <u>primary</u> purpose for the roadblock was to check for impaired drivers, we hold that the roadblock fails to satisfy in all events the first prong of the <u>Downey</u> test.

We turn now to the second prong: the degree to which the roadblock advanced the State's compelling interest. To the extent that the roadblock was operated in order to detect drunken drivers, <u>Downey</u> instructs us that roadblocks are "effective tools in advancing the State's interest in solving [the] serious public danger [posed by motorists driving under the influence]." 945 S.W.2d at 110. However, we see no "meaningful link" between the establishment of a roadblock and the interception of speeding and/or "aggressive" drivers. <u>Cf.</u> <u>Hicks</u>, 55 S.W.3d at 532. To the contrary, common sense indicates that a roadblock is a singularly ineffective means by which to detect such motorists. Unlike driving while intoxicated -- a bodily condition that the driver is helpless to change by a sheer act of will -- a speeding or aggressive driver may cease his or her unlawful behavior within seconds of being notified that he or she is in danger of apprehension, hence the Tennessee Highway Patrol's practice of "hiding" behind bridges or around curves in order to apprehend motorists driving in a dangerous manner. A speeding driver aware of an approaching roadblock will simply slow down. Being stopped at a roadblock will in no way detect such a driver. Thus, we find that, to the extent the roadblock was operated in order to apprehend speeding and "aggressive" drivers, it fails to satisfy the second prong of the <u>Downey</u> test.

We turn now to the third and final prong: the severity of the interference with personal liberty and privacy caused by the roadblock. As set forth above, <u>Hicks</u> instructs us that there are two critical factors essential to a finding that a particular roadblock is constitutionally reasonable: (1) the initial decision to establish the roadblock cannot have been made by the officer or officers who actually set up and conduct the roadblock, and (2) the officers conducting the roadblock cannot decide for themselves the procedures to be used in its operation. <u>See</u> 55 S.W.3d at 533. The roadblock before us fails on both of these counts.

The initial decision to set up the roadblock was apparently made by Deputy Chief Tommy Standifer. He and Lt. Newman then decided where the roadblock would be located. Our conclusion that both of these gentlemen served in an administrative capacity vis a vis establishing the roadblock is bolstered by the press release's advance directive to contact either of these men for further information about the roadblocks. Yet, both of these law enforcement officers were present at the scene of the roadblock. Indeed, Lt. Newman was the "safety coordinator" for the operation of the roadblock. Obviously, this aspect of the roadblock is in direct contravention of the requirements of <u>Downey</u> and <u>Hicks</u>, because the decisions about establishing the roadblock were made by the same men who were actually conducting it at the scene.[2] Furthermore, Lt. Newman testified that he decided on the scene about how to handle traffic backlogs, and that his method was contrary to that established by the guidelines. The trial court recognized that Lt. Newman "deviated from the procedure," but rationalized that the deviation was acceptable because Lt. Newman's personal procedure was "less restrictive" than that specified by the guidelines. The central concern with

---

[2]In fairness to the Hamilton County Sheriff's Department, the <u>Hicks</u> opinion had not been released as of the date of the roadblock in this case.

suspicionless seizures, however, is not <u>how</u> an officer exercises his or her discretion in the field, but <u>whether</u> he or she exercises an inordinate amount of it.  <u>Any</u> deviation from established guidelines indicates that an on-site officer's discretion is not properly limited.

The trial court also overruled the Defendant's motion to suppress on the grounds that the Sheriff's Department "used good faith to try to comply with the requirements of <u>Downey</u>." However, nowhere in <u>Downey</u>, <u>Hicks</u>, or any other case of which we are aware, is "good faith" set forth as the appropriate standard by which to measure the constitutionality of a suspicionless seizure.[3]  To the contrary, the law enforcement agency's "good faith" in conducting a roadblock is simply irrelevant.  Similarly, the trial court's conclusion about the public's level of "qualms" over the intrusions undertaken pursuant to the instant roadblock does not rescue the roadblock from constitutionally fatal mistakes.

In sum, this roadblock evinces an absence of <u>both</u> of the factors identified as essential by the <u>Hicks</u> decision.  Accordingly, we have no choice but to hold this roadblock unreasonable under Article I, section 7 of the Tennessee Constitution.  <u>See</u> <u>Hicks</u>, 55 S.W.3d at 533.

The State argues, and we acknowledge, that the roadblock in this case did comport with several constitutional requirements.  Specifically, the proof established that the Sheriff's Department stopped all cars passing through the roadblock, so long as traffic permitted; adequate safety precautions were taken, including warning approaching motorists of the roadblock and stopping cars only in a safe and visible area; the roadblock was conducted with uniformed officers and marked patrol cars with flashing emergency lights; and advanced publicity about the roadblock was furnished to the public at large.  <u>See</u> <u>Downey</u>, 945 S.W.2d at 110-12.  Nevertheless, these aspects of the roadblock do not overcome the constitutional infirmities set forth in this opinion.  We conclude that the roadblock before us simply does not pass constitutional muster under the <u>Downey</u>-<u>Hicks</u> analysis.

**CONCLUSION**

The trial court's denial of the Defendant's motion to suppress is reversed.  Accordingly, we vacate the Defendant's conviction and dismiss the charges against him.

_____

DAVID H. WELLES, JUDGE

---

[3]Indeed, in the context of arrests, the United States Supreme Court has recognized that, "If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police."  <u>Beck v. Ohio</u>, 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964).