IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 11, 2005

## STATE OF TENNESSEE v. JERRY WAYNE PATTERSON

**Direct Appeal from the Circuit Court for Henry County**
**No. 13581     Julian P. Guinn, Judge**

---

**No. W2004-00397-CCA-R3-CD  -  Filed July 6, 2005**

---

The defendant, Jerry Wayne Patterson, was convicted by jury of attempted first degree murder, a Class A felony, and sentenced to forty years in the Tennessee Department of Correction as a Range II, multiple offender.  On appeal, the defendant presents three issues for review: (1) whether the trial court erred by denying the defendant's motion to suppress his confession; (2) whether the trial court erred by denying the defendant's motion for judgment of acquittal; (3) whether the evidence was sufficient to support a guilty verdict for attempt to commit first degree murder.  Upon review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., concurred in the result and DAVID G. HAYES, J., filed a separate concurring opinion.

W. Jeffery Fagan, Assistant District Public Defender, for the appellant, Jerry Wayne Patterson.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I.  Facts

The proof at trial reflects that one evening Johnny Ray Singleton was shot while in his bedroom.  The defendant was subsequently indicted for attempted second degree murder.  A plea bargain offered by the State resulted in the *nolle prosequi* of the original indictment.  However, plea negotiations broke down and the defendant was re-indicted for attempted first degree murder.

At trial, Investigator Damon Lowe of the Henry County Sheriff's Department testified that he was assigned to investigate the shooting of Singleton.  During the course of his investigation, he

interviewed the defendant twice. At the first interview, Investigator Lowe asked the defendant if he was involved in the shooting and if he would submit to a test for gun residue. In response, the defendant told Investigator Lowe that he was not involved and submitted to the gun residue test. At the second interview, the defendant continued to deny involvement. According to Investigator Lowe, the defendant stated that he had been over at his girlfriend's sister's house with his girlfriend, Tina Bouie, but left after arguing with her. After leaving, the defendant stopped at Russell Barrett's house where both men sat around and drank. The defendant told Investigator Lowe that he and Barrett left the house around 2:00 a.m. to purchase drink mix. Soon after, they were stopped by police and arrested for DUI.

However, Investigator Lowe testified that the defendant later confessed to shooting Singleton. Investigator Lowe explained, that after leaving court one day, the defendant confessed to him in the presence of the defendant's attorney and the defendant's mother. According to Investigator Lowe, the defendant stated that after leaving his girlfriend, he picked up Barrett, stopped at Pocket's gas station to get something to drink, and drove out to Singleton's residence. Once there, the defendant walked around the back of Singleton's residence, walked up the back steps to the porch, looked into Singleton's bedroom window, saw Singleton's silhouette through the curtain, and fired one shot. After firing the shot, the defendant ran up a dirt hill behind the residence, got back into the car, and drove to his girlfriend's house. The defendant didn't stay long and drove to Scott Mart where he called his mom from a pay phone to see if he could come out to her house. Investigator Lowe stated that the defendant's confession was interrupted at this point.

Investigator Lowe testified that he obtained the video surveillance tapes from Pocket's. According to the videotapes, the defendant was at Pocket's at 12:06 a.m. not 2:00 a.m. Investigator Lowe also testified that he obtained the phone records from the pay phone at Scott Mart and discovered that a phone call had been made from the pay phone to the defendant's mother at 2:08 a.m. Investigator Lowe stated that from his investigation, he believed only one round had been fired from the gun. However, Investigator Lowe admitted that other than the bullet, no casing or weapon was ever found. Investigator Lowe described the weather conditions that night as rainy and described the ground around Singleton's residence as wet and muddy. Consequently, Investigator Lowe stated that he was unable to obtain any physical evidence from the crime scene.

On cross-examination, Investigator Lowe admitted that other possible suspects were identified during his investigation. First, Investigator Lowe stated that when Singleton was shot, he was in the bedroom having sex with Tammy Hollingsworth. Tammy Hollingsworth was the ex-wife of Tommy Hollingsworth. Investigator Lowe stated that he was aware of the fact that Tommy and Tammy had been in court over domestic assault charges since being divorced. Second, Investigator Lowe acknowledged that Singleton had threatened to kill Dion Chenilworth and police officer David Pike. According to Investigator Lowe, all three of these men had either dated or were associated with Singleton's ex-wife, Tina Bouie – the same Tina Bouie who was also the defendant's girlfriend. Investigator Lowe also noted that an unidentified male had been reported to have stopped by Singleton's residence earlier in the evening.

During cross-examination, Investigator Lowe stated that he was able to determine that the weapon used in the shooting of Singleton belonged to Russell Barrett. Investigator Lowe also stated that Barrett, a friend of Singleton, knew the layout of Singleton's residence. Investigator Lowe also admitted that when the defendant and Barrett were arrested for DUI he only asked the defendant to submit to a gun residue test. Investigator Lowe reiterated the fact that the defendant, in his statements, twice denied shooting Singleton. It was only after the preliminary hearing did the defendant confess to shooting Singleton.

According to Investigator Lowe's cross-examination, Barrett's first statement confirmed the defendant's story that he and the defendant had hung out at Barrett's place, drinking and playing video games; went to Pockets for some drink mix; and were eventually stopped by police. At the time of the statement, Barrett denied any involvement in the shooting of Singleton, and stated that he and the defendant had not gone over to Singleton's house. Also, when asked about owning a gun, Barrett stated that he had recently sold his gun back to the original owner the day before Singleton was shot. In a second statement, Barrett told Investigator Lowe that the defendant asked to borrow his gun but the gun was not loaded. Barrett again denied going with the defendant to Singleton's house. Barrett gave a third statement which was taped. In Barrett's third statement, he admitted that he was at Singleton's residence in the backyard and saw the defendant shoot the gun. However, Barrett's subsequent written statement was found to be incomplete and inconsistent with his taped statement, therefore, he was told to go home and correct it.

On re-direct examination, Investigator Lowe noted that the videotape of the defendant's arrest for DUI compared with the videotape from Pocket's, showed the defendant wearing a different set of clothes. According to Investigator Lowe, the videotapes corroborated Barrett's statement that the defendant changed clothes after shooting Singleton. Investigator Lowe also indicated that all other suspects were investigated and could not be linked to the crime. Investigator Lowe further stated that he could not find any motive for Barrett shooting Singleton. On re-cross examination, Investigator Lowe admitted that the defendant's change of clothes could also be explained by the fact that the car got stuck in the mud and the defendant got muddy as a result.

Dana Barrett, ex-wife of Russell Barrett, testified that the defendant had been dating her sister, Tina Bouie. Dana stated that on the evening of February 21, 2003, Bouie, her son Dylan, and the defendant came over to her house to watch movies. According to Dana, Singleton called his son Dylan. After talking to Dylan, Singleton spoke with Bouie for about fifteen minutes. While Bouie was on the phone, the defendant told Dylan that "he was going to kill his daddy." After Bouie got off the phone, she and the defendant began arguing about the fact that she was talking to her ex-husband, Singleton. After the argument, the defendant left in Bouie's black Thunderbird. Nonetheless, Dana stated that Bouie was not concerned because the defendant would typically go somewhere to cool off and would come back.

Dana testified that to her knowledge, Barrett did not have any motive to shoot Singleton. According to Dana, Barrett and Singleton were good friends. Dana further testified that she had not dated or had any romantic relationship with Singleton. On cross-examination, Dana admitted that

other than the night in question, she had never heard the defendant threaten anyone. Dana also admitted that her statement to Investigator Lowe indicated that she heard the defendant leave in Bouie's Thunderbird; whereas, her direct testimony indicated that she did not hear the defendant leave.

Johnny Ray Singleton testified that on the night of February 21, 2003, he had talked with his ex-wife, Tina Bouie, on the phone for about thirty to forty-five minutes and the conversation was not argumentative. Later that evening, he was shot while in his bedroom with a lady friend. The bullet hit his upper chest causing him to fall backwards. After being shot, Singleton stuck his finger in his wound and called 911. Singleton stated that he was first treated at the county hospital and later treated at the Jackson hospital. Singleton testified that he and Barrett were friends and could not think of any reason why Barrett would want to shoot him. On cross-examination, Singleton stated that he did not see who shot him. Singleton also stated that he knew the defendant and did not have a cordial relationship with him. According to Singleton, the defendant had never threatened him before, but they had confronted each other in the past.

Russell Barrett testified that he was good friends with both the defendant and Singleton. Barrett recounted that the defendant came to his house Friday evening saying, "I'm going to kill him. I'm going to kill him." Barrett told the defendant to calm down and have a drink. When the defendant decided to leave, Barrett left with the defendant. The two men drove to Pocket's. After buying two drinks and getting gas for Bouie's car, the two men headed out to Puryear where Singleton resided. According to Barrett, he began to black out after having too much alcohol, but remembered that the defendant drove into a driveway to the right of Singleton's house and parked the car. The defendant then asked Barrett to lead him around to the back of Singleton's house. Barrett testified that as he was climbing over a fence, he saw that the defendant had his gun. When asked what he was going to do, the defendant responded, saying that he was not really sure but was going to put the fear of God in Singleton. Barrett stated that he thought his gun was unloaded and the defendant was just going flash it in front of Singleton and start a fight.

Barrett testified that while on Singleton's deck, the defendant asked him which window was Singleton's window. After pointing to the window, Barrett walked over to an area close to the woods in the back of Singleton's yard to sit down because he was "pretty messed up." At that moment, Barrett saw a "flash and heard a bang." According to Barrett, the next thing he knew, he was running in the woods towards Bouie's car. Once in the car, the defendant informed him that he "got him." After stopping by Dana's house first, the defendant then drove to Barrett's house where both men changed clothes. After changing clothes, Barrett and the defendant decided to go to the defendant's mother's house. As they were leaving, Bouie's Thunderbird got stuck in the driveway. While en route, the defendant stopped at Scott Mart where he phoned his mother, telling her "I did it." As both men drove to the defendant's mother's house, they were pulled over by the police. The police questioned Barrett about the mud on his clothing so Barrett took the police to his house and showed them where the car had gotten stuck in his driveway.

Barrett testified that he came to own a gun after taking it as partial payment for a car he had sold. According to Barrett, the gun was unloaded and sitting on his counter top inside his house when the defendant came over.

On cross-examination, Barrett stated that he had been charged with attempt to commit first-degree murder and was out on bond. He also admitted that the gun used in the shooting of Singleton was his gun, and that he knew the layout of Singleton's residence. Barrett further admitted that his statements to Investigator Lowe had been inconsistent.

Laura Jane Hodge, forensic scientist with the Tennessee Bureau of Investigation testified that after the defendant's hands were tested for gunshot residue, the results were inconclusive. Nonetheless, Hodge stated that she found some trace elements of gun residue on the defendant's hands; therefore, she could not eliminate the possibility that the defendant fired a gun.

David Andrew Boyle, a patrol officer with the Henry County Sheriff's Department, testified that shortly after midnight on February 22, 2003, he was on patrol in the Puryear area when he answered a dispatch concerning a gunshot fired. As he pulled onto the state highway, he observed a black Thunderbird with tinted windows run a stop sign. Because of the emergency nature of the dispatch, he proceeded towards the residence of the reported shooting. However, he told his partner, Officer Wilson, to remember the black Thunderbird because it was the only vehicle they had passed while heading to the crime scene. Boyle further testified that after learning that this vehicle had been stopped by another police officer, he drove over to that area and identified the black Thunderbird as the one he had previously seen. Boyle stated that the defendant and Barrett were the occupants of the Thunderbird.

At the close of the State's proof, the defendant moved for judgment of acquittal. After the trial court denied the defendant's motion for judgment of acquittal, the defendant presented three witnesses.

As a defense witness, Officer Stanley Ray Pinson of the Henry County Sheriff's Department, testified that he pulled the defendant over for driving while intoxicated in the early morning hours of February 22, 2003. Officer Pinson stated that he observed mud on Barrett's pants and shoes, but none on the defendant.

Tina Bouie testified that she never heard the defendant threaten Singleton. Bouie testified that her sister, Dana, at one time, asked for permission to date Singleton. According to Bouie, she and the defendant had argued after speaking with Singleton on the phone on February 21, 2003. After learning that Singleton had been shot, Bouie went over to the hospital to visit. Later, Bouie informed the police of the events that transpired between her and the defendant.

Tammy Rene Hollingsworth testified that she was with Singleton when he was shot. Tammy Hollingsworth recounted that before Singleton was shot, she heard a loud truck pass by and thought it was her ex-husband, Tommy Hollingsworth. Tammy Hollingsworth further explained that her ex-

husband had threatened to kill her on February 21, 2003. On cross-examination, Tammy Hollingsworth denied telling the police that the defendant shot Singleton. Officer Pinson was then recalled by the State and testified that Tammy Hollingsworth told him that the defendant had shot Singleton and was driving Bouie's car.

The defendant did not testify at trial. The jury found the defendant guilty of attempted first degree murder. After a sentencing hearing, the trial court ordered the defendant to serve an effective forty-year sentence in the Department of Correction.

## II. Analysis

### A. Motion to Suppress

The first issue raised by the defendant is whether the trial court erred by denying the motion to suppress his confession. Specifically, the defendant asserts that his confession was given to Investigator Lowe in exchange for a bond reduction and with the understanding that his confession would only be used against him if Russell Barrett was unable to testify.

According to the arguments of counsel at the suppression hearing, the defendant and the prosecutor entered into plea negotiations in General Sessions Court. The State offered the defendant twelve years at 30% for attempt to commit second degree murder in exchange for the defendant's guilty plea. The defendant accepted the State's offer and was indicted on attempted second degree murder. It was also agreed that the defendant would receive a bond reduction in exchange for a confession. The defendant gave Investigator Lowe a statement which was taped and in return received a bond reduction.[1] After being released on bond, the defendant refused to accept the plea agreement. Thereafter, the defendant was re-indicted for attempt to commit first degree murder. At the suppression hearing, the defense counsel claimed that the State told him that the confession would only be used if something happened to Barrett. As a result, the defendant was misinformed when the defense counsel related this information to the defendant. The State maintained that it had accepted the defendant's confession with the condition that it would use the confession if something happened to Barrett or if the defendant backed out of the plea agreement. Following the suppression hearing, the trial court found that the defendant's confession was freely and voluntarily given primarily to obtain the bond reduction.

When reviewing the trial court's decision on a motion to suppress, this Court conducts a *de novo* review of the trial court's conclusions of law and application of law to facts. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). However, the trial court's ruling is binding unless the evidence contained in the record preponderates against it. See State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001).

---

[1] Due to faulty equipment the taped statement was not recorded.

In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined.  See State v. Bush, 942 S.W.2d 489, 500 (Tenn.1997).  "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense.  Rather, coercive police activity is a necessary predicate to finding that a confession is not voluntary."  State v. Smith, 933 S.W.2d 450, 455 (Tenn.1996) (citations and internal quotations omitted).  A confession resulting from a state official's promises are not automatically considered involuntary.  Id.  The crucial question is whether the behavior of the state officials was such as to overbear the accused's will to resist and trigger an involuntary confession.  Id.

Our examination of the circumstances surrounding the defendant's confession establish that the defendant was approximately thirty-three years old and had prior experience with the judicial system.  At the time the defendant gave his confession, both his attorney and mother were present.  As part of a proposed plea agreement, the defendant was offered a bond reduction.  In return, the State asked the defendant for a confession in order to preserve its evidence in the event that the defendant, once released on bond, decided to render their primary witness unavailable.  The defendant received the bond reduction and was released on bond.  Once released, the defendant decided to reject the plea agreement thereby compelling the State to re-indict and take the matter to trial.  Applying the above standard, there is no preponderance of evidence that, at the time of the confession, the defendant's will was overborne by coercive police behavior.  Therefore, we conclude that the trial court properly denied the defendant's motion to suppress.

## B.  Motion for judgment of acquittal

The defendant claims that the trial court erred by denying the defendant's motion for a judgment of acquittal.  Because "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction," this claim will be included with the defendant's challenge to the sufficiency of the convicting evidence for attempt to commit first degree murder.  State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).

## B.  Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence.  Specifically, the defendant asserts that the evidence was insufficient because: (1) no physical evidence was found implicating the defendant; (2) some of the State's witnesses were shown to be inconsistent and not credible; (3) and the testimony of some witnesses pointed to possible suspects other than the defendant.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt.  State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).  Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict.  State v.

Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R.App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the States' witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be from that evidence. Carruthers, 35 S.W.3d at 558; Tuggle, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence, nor do we substitute our inferences drawn from the circumstantial evidence for those drawn by the trier of fact. State v. Elkins, 102 S.W.3d 581, 582 (Tenn. 2003); State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002); Bland, 958 S.W.2d at 659.

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13- 202(a)(1). Therefore, to convict the defendant of attempted first degree murder, the State was required to prove that the defendant, acted with the kind of culpability otherwise required for first degree murder. Tenn. Code Ann. § 39-12-101(a)(2). That is, the defendant acted "with intent to cause a result that is an element of the offense, and believe[d] the conduct [would] cause the result without further conduct on [his] part . . . ."

The proof establishes that the defendant told Singleton's son that he was going to "kill his daddy." The defendant then obtained a gun and shot Singleton in the chest. Before shooting Singleton, the defendant told Barrett that he was going to kill Singleton. After shooting Singleton, the defendant was heard making the statements "I got him" and "I did it." This evidence clearly supports the elements necessary to prove criminal attempt to commit first degree murder.

With respect to the defendant's arguments regarding the credibility and contradictions of witness testimony, it is the jury's prerogative to accredit witness testimony and weigh the evidence. Here, the testimony of the State's witnesses not only independently established that the defendant committed the offense, but also corroborated the defendant's own confession. In addition, the inconsistent statements and credibility issues were either brought out on cross-examination or presented through the testimony of the defense witnesses. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. By their verdict, the jury exercised their prerogative and chose to accredit the testimony of the State's witnesses over the testimony of the defendant's witnesses. Accordingly, the defendant's sufficiency arguments are without merit.

### III. Conclusion

We affirm the trial court's suppression of the defendant's confession and conclude that the evidence was sufficient to support the defendant's convictions. Accordingly, the judgment of the trial court is affirmed.

_____

J.C. McLIN, JUDGE