IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2009 Session

**STATE OF TENNESSEE v. ABBY L. MILLS**

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 8331-A     Joseph H. Walker, Judge**

_____

**No. W2008-00984-CCA-R3-CD  - Filed May 11, 2009**
_____

The defendant, Abby L. Mills, was indicted by the Lauderdale County Grand Jury of possession of a Schedule II controlled substance, cocaine, with the intent to deliver; possession of a Schedule III controlled substance, Hydrocodone, with the intent to deliver; and possession of a Schedule VI controlled substance, marijuana, with the intent to deliver over .5 ounces.  After a hearing, the trial court granted defendant's motion to suppress evidence of items found in the defendant's home.  On appeal, the state asserts that the trial court erred in suppressing the evidence obtained as a result of a valid search warrant.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Alan E. Glenn and Camille R. McMullen, JJ., joined.

Rebecca Mills, Ripley, Tennessee, for the appellee, Abby L. Mills.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Julie Pillow, Assistant District Attorney General, for the appellant, State of Tennessee.

**OPINION**

Background
        The defendant was indicted on three counts of possession of a controlled substance with the intent to deliver.  Prior to a trial, the defendant filed a motion to suppress the evidence obtained pursuant to a search warrant of the residence the defendant shared with Mr. Christopher Younger. The following testimony was presented at a hearing on the defendant's motion.  Garrison Taylor with the Covington Police Department testified that his unit received a tip from a confidential informant that Mr. Younger had delivered large amounts of marijuana to the informant's residence. Based on the tip, his unit began an investigation of Mr. Younger.  In a "buy/bust" operation, Mr. Younger was contacted by the informant and requested to bring one pound of marijuana to the home of the informant on Mill Road.  The telephone call was monitored by the police and Mr. Younger's

voice was identified by the informant. Approximately twenty minutes after the telephone call, Mr. Younger arrived at the informant's home in a truck accompanied by three other individuals. Mr. Younger entered the informant's residence with approximately one pound of marijuana and was arrested. The three occupants in Mr. Younger's truck were taken into custody and interviewed. All three passengers stated that they had come directly from the residence where Mr. Younger lived to the informant's residence without making any additional stops. Officer Taylor sent "two agents with the Drug Task Force that were actually Ripley officers to [Mr. Younger's] residence to secure the residence so that [he] was able to acquire or attempt to acquire a search warrant for that residence." An affidavit claiming that there was probable cause to search the residence was prepared and signed by Officer Taylor. The affidavit was made an exhibit at the hearing and states:

> Personally appeared before me Agent Garrison Taylor of the 25[th] Judicial Drug Task Force who makes oath that He has probable cause for believing and does believe that Christopher J. Younger is in possession of the following described property, to-wit: Marijuana, a schedule VI controlled substance and/or any other drug related paraphernalia, controlled substances, records, monies, and any gang related paraphernalia contrary to the laws of the State of Tennessee, upon the following described premises to wit: 664 Brogdon Rd. Henning TN, a single story wood framed residence with tan siding, maroon shu[tt]ers and a black roof. The address is located on the mailbox situated in front of the residence. Search to include all outbuildings and vehicles related to said premises; and the reason for such belief and the probable cause for such belief are that agents received information from a confidential informant that Christopher Younger was delivering large amounts of Marijuana to his residence at 130 Mill Rd. in the City of Covington, TN. Acting on this information agents began an investigation. Agents went to the residence of 130 Mill Rd. Covington, TN. and spoke with the confidential informant. Agents then wired said confidential informant with an audio/video recording device. Said informant then contacted Christopher Younger at his residence in Henning TN. by calling phone number . . . . Said informant then spoke to a male, who said informant knew as Christopher Younger. Said informant and Christopher Younger spoke momentarily and then said informant requested that Christopher Younger deliver him one pound of Marijuana. Christopher Younger stated that he was about to leave and go to Brighton TN. and that he would bring the package to said informants residence. Said confidential informant then agreed and ended the phone conversation with Christopher Younger. Agents then left said residence and took position within a mile of said residence where agents monitored the confidential informant via listening device. Approximately twenty minutes of making the phone call, Agents monitored the confidential informant state that he, Christopher Younger, is here. Agents then surrounded said residence where Christopher Younger was discovered inside the residence and in possession of a clear plastic bag containing a green plant-like substance which appeared to be Marijuana. Agents also discovered a White Chevrolet truck in the driveway of said residence, which was registered to a Christopher Younger. Agents discovered several passengers inside the vehicle whose names are as follows: Cliff Proctor, age 18, Christopher Brown, age 22 and Bradley Younger, age 23. Agents spoke with the passengers of the vehicle who

stated that they met at Christopher Younger's residence in Henning, TN. to go to Brighton arms in Brighton, TN, in order to pick up some items to target shoot. Passengers stated that they left Christopher Younger's residence with Christopher Younger, in his vehicle and drove directly to 130 Mill Rd. Covington, TN. Passengers state that Christopher Younger exited the vehicle at said residence and went inside said residence. Passengers advised this is when the police arrived to said residence and took said passengers into custody. Agents also utilized a K9 narcotics sniffing dog, which was handled by Agent Joey Rhea. Agent Rhea stated that said K9 alerted on two separate areas of Christopher Younger's vehicle. Agents then searched said vehicle. Upon searching said vehicle Agents discovered a handgun in the glove compartment of said vehicle. Agents discovered via Christopher Younger that he had said handgun by way of his grandfather. Agents believe that Christopher Younger delivered the approximate one pound of Marijuana to the said residence and that the said Marijuana was brought from the residence of Christopher Younger at 664 Brogdon Rd. in Henning TN. Agents believe that additional Marijuana and/or illegal narcotics still remain at said residence of 664 Brogdon Rd. Henning, TN. This did occur within the past 72 hours.

Affiant therefore asks that a warrant be issued to search the premises herein described either by day or night, where he believes said Marijuana, a schedule VI controlled substance and/or any other drug related paraphernalia, controlled substances, records and monies are now possessed, contrary to the Laws of the State of Tennessee.

On cross-examination, Officer Taylor testified that because Mr. Younger went directly from his residence to the residence of the informant and arrived with approximately one pound of marijuana, he believed that there were illegal drugs at Mr. Younger's residence. Officer Taylor stated that police officers were sent to secure the residence while he obtained a search warrant to avoid having Mr. Younger, or one of the occupants of his vehicle, contact the defendant, Abby Mills, and advise her to destroy any illegal drugs at the residence.

Officer John Thompson with the Lauderdale County Sheriff's Office assigned to the drug task force testified that after Mr. Younger's arrest, he interviewed the occupants of Mr. Younger's vehicle. All of the occupants gave statements indicating that they left Mr. Younger's residence and traveled directly to the informant's residence on Mill Road. Officer Thompson agreed that all three of the occupants could have alerted individuals at Mr. Younger's residence that the police were obtaining a search warrant. On cross-examination, Officer Thompson recalled that one of the occupants tried to use his cell phone while being detained. Officer Thompson stated that a bag similar to the bag Mr. Younger carried into the informant's house was found inside Mr. Younger's truck, however, stated that no evidence or statement connected the bags with Mr. Younger's residence.

Greg Land, drug investigator with the Ripley Police Department, testified that after approximately twenty minutes at the Mill Road residence in Covington, he and Officer Rhea proceed to Mr. Younger's residence on Brogdon Road in Henning. They parked in the driveway and

knocked on the front and back doors, announcing who they were. Officer Land stated the windows were covered with blinds and he assumed that no one was home. They remained in the front yard of the residence and waited for officers to arrive with a search warrant.

Officer Land stated that approximately one hour after they arrived at the residence on Brogdon Road, Officer Rhea spotted the defendant in the house. Officer Rhea approached the front door, announced who he was, and "told [the defendant] to open the door." Officer Land testified that he then went to the front porch and told the defendant that Mr. Younger had been arrested. Both police officers entered the house. Officer Land could not recall if the defendant nodded, indicating that he and Officer Rhea could enter the house, or if the defendant actually stated "come in." Officer Land stated that he asked for permission to search the house, and when the defendant declined the request, Officer Land "told her to have a seat until [the police] arrived with a warrant." Officer Land denied that a search was performed before the warrant arrived and stated that while they waited, the defendant was allowed to go to the bathroom. However, the defendant was accompanied to the bathroom by Officer Rhea because they did not want the defendant to get out of their sight and obtain a weapon or destroy evidence. Officer Land stated that as they waited for the warrant, the defendant's phone rang "[m]ore than a dozen" times, however, the defendant was not allowed to answer the calls. On cross-examination, Officer Land agreed that he and Officer Rhea were armed, that they did not inform the defendant that she was free to leave the residence, and that the defendant was pregnant and appeared upset.

Officer Rhea with the Ripley Police Department testified that he and Officer Land were outside the defendant's residence for one hour before the defendant opened the door. Officer Rhea stated that he called out to the defendant, stating, "Abby, it's the police department. Open the door." Officer Rhea further testified that when the defendant opened the door, Officer Land explained the situation and the defendant asked the officers to come in. Officer Rhea agreed that the defendant was alone in the house, pregnant and obviously frightened. He stated that he saw nothing in plain view indicating illegal activity. On cross-examination, Officer Rhea was asked if Officer Land was correct when he said they "entered the residence and then the conversation took place between [the police] and [the defendant]." Officer Rhea testified that Officer Land's testimony was not accurate and instead claimed that the defendant opened the door and the police officers told her why they were there, then they stepped inside the house. Officer Rhea agreed that it appeared that the defendant knew that they were outside for some time, but did not answer the door. Officer Rhea agreed that he and Officer Land were only able to enter the residence after he told the defendant to open the door.

After taking the matter under advisement, the trial court issued a written order granting the defendant's motion to suppress the evidence obtained by police officers in the defendant's home pursuant to the search warrant issued on August 30, 2007. The state has appealed.

Analysis

I. Warrantless entry

On appeal, the state argues that the trial court's suppression of the evidence found in the defendant's home was based on erroneous findings by the court that the officers entered the defendant's residence without consent and upon an "unsubstantiated claim of exigent circumstances." In the alternative, the state asserts that even if the warrantless entry and the temporary restraint were unlawful, the evidence was "seized as a result of legally sufficient and properly executed search warrant." The state argues no evidence was identified or seized until the arrival of the search warrant.

When reviewing a trial court's decision on a motion to suppress, the court conducts a de novo review of the trial court's conclusions of law and application of law to facts. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). However, the trial court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence,* 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Moreover, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001).

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A similar guarantee is provided in Article I, section 7 of the Tennessee Constitution:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty.

The essence of these constitutional protections is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). As a result, warrantless searches and seizures inside a residence are presumed to be unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). "Even though a felony has been committed and officers have probable cause to believe that they will locate incriminating evidence inside a residence, a warrantless entry to search for contraband or weapons is unconstitutional absent exigent circumstances." *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005) (citing *Payton*, 445 U.S. at 587-588).

In the instant case, the trial court found "that the intrusion to secure the residence of [the defendant] was illegal[,]" and further that "[t]he seizure of the [the defendant] was not permissible under the circumstances in this case." The record before us indicates that Officer Taylor dispatched Officers Land and Rhea to secure the residence in Lauderdale County while he attempted to secure a search warrant for the residence. Officer Taylor dispatched the officers based on his fear that any illegal drugs located at the residence would be destroyed. Officers Land and Rhea arrived at the residence, knocked on the front and back doors, walked around the residence, and attempted to look into the windows of the residence. The police officers then waited outside the residence for approximately one hour. Thereafter, Officer Rhea spotted the defendant in the residence and called out to her by name and told her to open the door. Officer Rhea admitted that it appeared that the defendant knew the police were outside of her house, but did not open the door until he commanded her to do so. Officer Land testified that they went into the house. Officer Land asked for permission to search the house, but the defendant denied permission. The defendant was then told to sit and wait for the search warrant to arrive. Officers Land and Rhea both stated that the defendant was pregnant and appeared upset and frightened. Officers testified that they did not inform the defendant that she was free to leave. Officers both agreed that Officer Rhea followed the defendant to the bathroom, and that the defendant was not allowed to answer numerous telephone calls made to the residence.

Viewed in a light most favorable to the defendant and with due deference to the trial court's factual findings, the record shows that the officers entered the defendant's private residence and remained inside without a warrant and without the defendant's permission. Furthermore, as found by the trial court, the record does not support the existence of exigent circumstances justifying the warrantless entry into the residence. The police officers were outside of the defendant's residence for approximately one hour before they entered the home, giving the defendant ample time to receive calls and destroy evidence if such was her intent. Here, the risk of the destruction of evidence, i.e., the alleged exigent circumstance, was created solely by actions of the police officers in going to the defendant's residence and entering the residence without a warrant in order to secure the residence for a later search. Therefore, the warrantless entry of the defendant's residence and her detention by officers in this case was not supported by exigent circumstances and was unlawful. *See Carter*, 160 S.W.3d at 531.

## II. Independent source doctrine

Having concluded that the warrantless entry was unlawful, we next examine the effect of the illegal entry on the admissibility of the evidence subsequently seized from the defendant's residence. *See Carter*, 160 S.W.3d at 532. The exclusionary rule may bar the admission of evidence obtained from an unconstitutional search or seizure, however, the "rule does not apply to evidence obtained by means independent of the constitutional violation." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 485-87 (1963). To expound:

> Pursuant to the independent source doctrine, an unconstitutional entry does not compel exclusion of evidence found within a home if that evidence is subsequently discovered after execution of a valid warrant obtained on the basis of facts known entirely independent and separate from those discovered as a result of the illegal entry. Further, even "plain view" evidence observed during the

warrantless entry will not be excluded so long as (1) the evidence is later discovered during a search pursuant to a valid warrant, (2) this valid warrant was obtained without reference to evidence uncovered during the illegal search, and (3) the government agents would have obtained the warrant even had they not made the illegal entry.

In order for the subsequent warrant and search to be found genuinely independent of the prior unconstitutional entry, the . . . information obtained during the illegal entry may not have been presented to the issuing Magistrate.

*State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992) (citations omitted). "The underlying policy of the independent source doctrine is that 'while the government should not profit from its illegal activity, neither should it be placed in a worse position that it would otherwise have occupied.'" *Carter*, 160 S.W.3d at 532 (citing *Murray v. United States*, 487 U.S. 533, 542 (1988)).

The record in the instant case reveals that no evidence was identified or seized during the initial entry and detention. The affidavit supporting the warrant did not refer to the entry or the detention of the defendant. Additionally, the information in the affidavit was obtained prior to the initial entry. Accordingly, we conclude that the unlawful entry and detention did not taint the evidence ultimately seized pursuant to the search warrant. *See Carter*, 160 S.W.3d at 533. However, our analysis does not end here. We must next consider whether the affidavit supporting the issuance of the search warrant under which the evidence was seized established probable cause to search the defendant's residence. *Id.*

### III. Probable cause for the issuance of a search warrant

The Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Probable cause has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Henning*, 975 S.W.2d 290, 294 (Tenn. 1998) (citing *Lea v. State*, 181 S.W.2d 351, 352 (Tenn. 1944)). No warrant should issue except upon probable cause based upon evidence appearing in a written and sworn affidavit. *State v. Jacumin*, 778 S.W.2d 430, 436 (Tenn. 1989); *see also* Tenn. Code Ann. § 40-6-103. "[P]robable cause to support the issuance of the warrant must appear in the affidavit and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." *State v. Moon*, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992) (citing *Jacumin*, 778 S.W.2d at 432)). Conclusory statements by an affiant alone will not provide probable cause sufficient to support the validity of a search warrant. *See Jacumin,* 778 S.W.2d at 437. On appeal, we must determine whether "the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing[.]" *Id.* at 432.

To establish probable cause, an affidavit may rely on hearsay information from a confidential informant if the affidavit also provides facts sufficient to establish reliability. *Henning*, 975 S.W.2d at 294-95. "In determining the reliability of the information contained in an affidavit, a distinction exits between a 'citizen-informant' or a bystander witness and criminal informants or those from a

'criminal milieu.'" *Carter*, 160 S.W.3d at 534 (citation omitted). Information obtained from a "citizen-informant" known to the affiant is presumed reliable. *Id.* However, if the affidavit does not provide any information regarding the status of a confidential informant as an "anonymous caller" or a "citizen-informant," there is no presumption of reliability. *Id.* Instead, the two-prong test for the reliability of information provided by criminal informants must be applied. *Id* (citations omitted). According to the test, when the affiant relies upon hearsay information from a confidential informant, the affidavit must inform the issuing magistrate of the basis of the knowledge provided by the informant and either the basis of credibility of the informant or the reliability of the informant's information. *Id.* In order to satisfy the first prong, the knowledge prong, the affiant must have informed the magistrate of some of the underlying circumstances which led to the informant's knowledge. *Moon*, 841 S.W.2d at 338. To satisfy the second prong, the veracity prong, the affidavit must have informed the magistrate of some of the underlying circumstances from which the affiant concluded that the informant was credible or the informant's information was reliable. *Id.*

Independent police corroboration of the informant's information may make up for deficiencies in either prong. *State v. Powell*, 53 S.W.3d 258, 263 (Tenn. Crim. App. 2000). If there is no indication that the informant had any history of police cooperation, or of providing information to police which led to prior arrests or convictions,"[s]ome other indicia of the informant's credibility and reliability, such as independent police corroboration, [is] required to support the credibility of the informant and by extension, support an independent finding of probable cause." *State v. Charles Ricky Pipkin, Jr.*, No. W2007-01110-CCA-R3-CD, 2008 WL 4117966, at *7 (Tenn. Crim. App., at Jackson, Sept. 4, 2008). Police corroboration providing for only one element of non-suspect behavior and offering little support to the credibility of the informant or the reliability of the informant's information will not be sufficient to bolster information provided by a confidential informant. *State v. Smotherman,* 201 S.W.3d 657, 663 (Tenn. 2006) (holding an affidavit did not contain sufficient police corroboration to establish the reliability of an informant's information regarding the occurrence of illegal drug transactions at the defendant's residence).

In the instant case, the affidavit supporting the search warrant relies on information from a confidential informant. Therefore, in making a determination of whether the issuance of the search warrant was supported by probable cause, there is no presumption of reliability. *See Carter*, 160 S.W.3d at 534. While the affidavit recounts the informant's knowledge as to the fact that Mr. Younger delivered marijuana to the informant's residence, the affidavit does not reflect that the informant had actual knowledge regarding illegal activity occurring at the defendant's residence. There is nothing in the affidavit to show that the residence had been under police surveillance or that any surveillance had uncovered suspect activity at the residence. Police corroboration reported in the affidavit provides only that the passengers in Mr. Younger's vehicle indicated that Mr. Younger traveled from the defendant's residence to the residence of the informant. Evidence of the route taken by Mr. Younger prior to being arrested provides little, if any, corroboration of the informant's knowledge that drugs or contraband were located at the defendant's residence. *See Smotherman,* 201 S.W.3d at 663. Consequently, the informant's information fails to link Mr. Younger's delivery of drugs to any drugs suspected to be found at the defendant's residence. The basis for the affiant's belief that illegal drugs or contraband existed in the defendant's residence amounted to conclusory statements by the affiant, which were insufficient by themselves to provide probable cause. *See*

*Jacumin,* 778 S.W.2d at 437. Additionally, the affidavit does not provide sufficient corroboration of the reliability of the informant or the informant's basis of knowledge concerning the defendant's residence. The affidavit contains no statement to support previous verifiable activities by Mr. Younger involving illegal drugs and does not report police surveillance of the residence. There is nothing in the affidavit to show verifiable information that the informant had worked with the police in the past. We conclude that the search warrant was not supported by probable cause. Evidence or statements obtained as fruits of an illegal search warrant must be suppressed. *See Wong Sun*, 371 U.S. at 485. Accordingly, the evidence obtained as a result of the search of the defendant's home must be suppressed as the fruit of an illegal entry and a subsequent illegal search.

## CONCLUSION

Because the affidavit supporting the issuance of the search warrant was not sufficient to establish probable cause, we affirm the judgment of the trial court.

_____
J.C. McLIN, JUDGE